RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0259p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

    *v.*

WILLIAM DALLAS ELMORE,

        *Defendant-Appellant*.

Nos. 21-5121/5145

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:16-cr-00128-1—Charles R. Simpson, III, District Judge.

Decided and Filed: November 12, 2021

Before: BOGGS, WHITE, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** R. Kenyon Meyer, DINSMORE & SHOHL LLP, Louisville, Kentucky, for Appellant. Monica Wheatley, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee.

─────────────────

## OPINION

─────────────────

CHAD A. READLER, Circuit Judge. During an investigation into whether William Elmore sexually abused a seven-year-old girl, Elmore's stepmother gave officers three key fobs for Elmore's Ford Mustang. Aided by a warrant, a subsequent search of the fobs revealed a memory card containing child pornography. Elmore was later indicted on one count of knowingly possessing child pornography. During his prosecution, Elmore twice moved to suppress the memory card evidence. Failing on both fronts, Elmore later pleaded guilty, but

preserved his right to appeal the suppression rulings, which he now presents for our review. Finding no basis to exclude the memory-card evidence found on one of the key fobs, we affirm both Elmore's conviction and the revocation of his earlier term of supervised released premised on his conviction.

## BACKGROUND

History, it is often said, repeats itself. Regrettably, that appears to be the case for William Elmore and his interest in child pornography. Seven years ago, we considered his first conviction for possessing child pornography, which resulted from school officials discovering illicit images on a flash drive Elmore had left behind in a University of Louisville computer lab. *United States v. Elmore*, 743 F.3d 1068, 1070 (6th Cir. 2014). We affirmed Elmore's below-Guidelines sentence of 51 months of imprisonment, followed by ten years of supervised release. *Id.* at 1069–70, 1076.

Elmore was released from prison in February 2015 to begin his term of supervised release. Yet, within a year of his release from prison, computer monitoring showed that Elmore was watching and attempting to download foreign-language YouTube videos of prepubescent children undergoing medical examinations. A search of Elmore's home unearthed photos of naked prepubescent children, a duffel bag of panties for little girls, unauthorized hard drives and cell phones, and adult pornography. At the same time, a detective from the University of Louisville familiar with Elmore's earlier conviction informed the Probation Office that three images of what he considered to be child pornography were discovered on a University computer that Elmore had used. The district court revoked Elmore's supervised release and sentenced him to a prison term of six months.

Elmore's legal problems would deepen from there. While he was serving his revocation sentence, officers interviewed a fellow inmate in whom Elmore had allegedly confided. With considerable detail, the inmate told the officers that Elmore had bragged about repeatedly sexually abusing a seven-year-old girl and recording their interactions. On top of that, Elmore claimed to have several unapproved electronic storage devices containing child pornography hidden in a Ford Mustang and in a storage unit. These revelations coupled with Elmore's past

behavior led officers to obtain a warrant to remove Elmore's Mustang from his stepmother's home and search the vehicle. When officers executed the warrant, Elmore's stepmother gave the officers a key fob for the vehicle. Relying in part on the inmate's tip and their conversations with Elmore's stepmother, police also obtained a warrant to search a storage unit containing Elmore's belongings. Neither search, however, yielded any incriminating evidence.

Elmore was released from custody approximately two months later. He returned to Louisville where he rendezvoused with his stepmother. As the two caught up, Elmore's stepmother apprised him of the searches that took place while he was in prison. When she disclosed that police had seized his Mustang, Elmore's attitude noticeably changed. He asked in a concerned manner whether officers had seized all of the key fobs. She responded affirmatively. But Elmore's reaction caused her to double-check and discover that she still possessed two other key fobs. She then relayed her conversation with Elmore to a Louisville police officer and asked that the officer take the two remaining fobs. In another conversation, Elmore's stepmother further indicated to officers her nagging suspicions that Elmore was hiding child pornography on one of the fobs, suggesting that they "at least check . . . and see."

Officers sought a search warrant for the contents of all three fobs. In the affidavit attached to the warrant, a veteran officer detailed the (1) the tips he received from Elmore's fellow inmate; (2) the seizure and search of the Mustang; (3) disclosures made by Elmore's stepmother regarding her conversations with Elmore and her concerns about the key fobs; and (4) the officer's experience with child pornography investigations, including the tendency of child pornography suspects (like Elmore) to hide electronic devices to prevent discovery of illicit materials. A magistrate approved the search warrant. During the ensuing search, officers found in one of the fobs a memory card containing a video of child pornography.

A grand jury indicted Elmore on one count of knowingly possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2). Elmore twice moved to suppress the evidence found on the memory card on the grounds that the search warrants for the Mustang, storage unit, and fobs were deficient, meaning the evidence found on the fob was derived from illegal searches. In each motion, Elmore requested an evidentiary hearing to examine the validity of the warrant affidavits under *Franks v. Delaware*, 438 U.S. 154 (1978). Largely adopting a

magistrate judge's recommendations, the district court denied both motions and declined to hold a *Franks* hearing. Elmore later pleaded guilty, reserving his right to seek appellate review of the suppression rulings. The district court sentenced Elmore to 120 months of imprisonment on the child-pornography-possession count and 18 months of imprisonment, to be served concurrently, for supervised-release violations. Elmore's timely appeal followed.

## ANALYSIS

Before us are Elmore's challenges to the district court's rulings denying the suppression of the memory-card evidence along with Elmore's request for a *Franks* hearing. On both fronts, we review the district court's factual findings for clear error and its legal conclusions de novo. *See United States v. Bateman*, 945 F.3d 997, 1007 (6th Cir. 2019).

The legal framework for resolving Elmore's appeal is largely settled. The Fourth Amendment, it is well understood, requires that a search warrant be supported by probable cause. *See* U.S. CONST. amend. IV. But it is silent as to the remedy afforded one whose property is searched or seized subject to a warrant lacking probable cause. To enforce the Constitution's probable-cause requirement, the Supreme Court long ago recognized the exclusionary rule—that is, the rule that bars courts from allowing unlawfully seized evidence to be used in a criminal trial—as the "principal judicial remedy" for Fourth Amendment violations by federal officers. *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016); *see also Weeks v. United States,* 232 U.S. 383, 398 (1914). Application of the exclusionary rule, however, is a "last resort," not an immediate impulse. *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)); *see also Davis v. United States*, 564 U.S. 229, 237 (2011) ("[S]ociety must swallow this bitter pill . . . only as a last resort.") (cleaned up); *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364–65 (1998) (observing that the exclusionary rule's "costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule" (cleaned up)). That is so in part because exclusion is not an individual right, but rather a judicially crafted means of preventing future Fourth Amendment violations. *Herring*, 555 U.S. at 139–41. As a result, the rule's "reach" is limited by its "deterrence rationale," *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011), meaning it "does not apply when the costs of exclusion outweigh its deterrent benefits," *Strieff*, 136 S. Ct. at 2059; *see*

*also Herring* 555 U.S. at 143 (emphasizing that the rule seeks to curtail "intentional conduct that was patently unconstitutional").

These principles inspired an "offshoot" of the exclusionary rule (and a colorful legal metaphor): the fruit-of-the-poisonous tree doctrine. *United States v. Leake*, 95 F.3d 409, 411 (6th Cir. 1996). In a nutshell, this doctrine counsels for the exclusion of evidence "derived from information or items obtained in [an illegal] search." *See id.* (citing *Murray v. United States*, 487 U.S. 533, 536–37 (1988)). As the use of the word "derived" suggests, the doctrine extends to evidence not directly obtained in an illegal search. But in keeping with the deterrence rationale for the exclusionary rule, derivative evidence will not be suppressed where the causal connection between challenged evidence and the constitutional violation is remote or attenuated. *Hudson*, 547 U.S. at 593. That is so because "there is little to deter if the officers' conduct is not the 'unattenuated caus[e]' of the evidentiary discovery." *Clariot*, 655 F.3d at 553 (quoting *Hudson*, 547 U.S. at 594). In this vein, to determine whether evidence should be excluded as fruit of the poisonous tree, we ask whether the evidence "has been come at by exploitation of [the underlying] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

For these reasons, "[t]he mere existence of fruitless unlawful searches does not taint a subsequent lawful one." *See United States v. Haddad*, 558 F.2d 968, 975 n.6 (9th Cir. 1977). To the contrary, the challenged evidence must be "derived from information or items obtained in the [illegal] search." *Leake*, 95 F.3d at 411; *see also United States v. Alexander*, 540 F.3d 494, 501 (6th Cir. 2008) (observing that the "fruit of the poisonous tree doctrine bars introduction of derivative evidence that is the product of the primary illegally obtained evidence or testimony") (cleaned up); *see generally* 43 A.L.R.3d 385, § 4 (originally published in 1972) (defining the fruit-of-the-poisonous-tree doctrine as a prohibition against the admission of evidence that police "located . . . as a result of information and leads obtained from illegally seized evidence"). This commonsense limitation reflects the reality that any causal connection between challenged evidence and a search that uncovers no new information is likely remote.

A. With these principles in mind, we turn to Elmore's central argument for suppressing the memory card. That argument proceeds in two steps. First, to Elmore's mind, the searches of

the car and the storage unit lacked probable cause, as the warrant affidavits were insufficiently specific and based on an unreliable informant, and the duration of the seizure of the Mustang exceeded the bounds of reasonableness. From there, Elmore contends that the evidence ultimately found in the key fob came to light only after his reaction to his stepmother's revelations about the purportedly illegal searches and seizures. On that basis, Elmore maintains that the evidence found in the key fob is fruit of the poisonous tree.

It is often the case that the more difficult an argument is to explain, the less likely it is to persuade. That maxim fairly applies here. Elmore's elaborate theory relies on an attenuated causal chain and numerous logical leaps. A threshold problem with Elmore's theory is that it seems to lack a key element of a "fruit of the poisonous tree" claim—the fruit. After all, as Elmore concedes, the allegedly illegal searches of the Mustang and storage unit yielded no incriminating evidence—that is, they were *fruitless*.

That reality leads Elmore to turn his focus from the tangible (fruit) to the intangible: his *reaction* to learning of the existence of a purportedly illegal search. According to Elmore, his incriminating reaction to news of an illegal search justifies suppression of any evidence his reaction yields. But Elmore cites no authority for the counterintuitive position that evidence can be suppressed based on one's reaction to a fruitless search or seizure. Instead, the police must have obtained some information or lead during the allegedly illegal searches or seizure, or otherwise exploited the searches. We thus decline Elmore's invitation to extend the fruit-of-the-poisonous-tree beyond cases in which officers exploit information or evidence they obtained during a Fourth Amendment violation.

And even were the fruit-of-the-poisonous-tree doctrine viable here, familiar attenuation principles counsel against suppressing the memory card evidence. In assessing whether unconstitutional conduct is sufficiently attenuated from the challenged evidence, thereby making suppression inappropriate, we consider: (1) the temporal proximity between unconstitutional conduct and the discovery of the challenged evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *See Strieff*, 136 S. Ct. at 2062 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). All three factors favor the government here.

Start with temporal proximity.  The searches and initial seizure of the Mustang and the search of the storage unit occurred nearly two months before the discovery of the hidden memory card.  That gap between the illicit conduct and the challenged evidence's discovery weighs in favor of the evidence's admissibility.  *See, e.g.*, *United States v. Gross*, 662 F.3d 393, 402 (6th Cir. 2011) (holding that two months "elaps[ing] between the unlawful seizure of Gross . . . and Gross's subsequent voluntary confession . . . weighs significantly toward attenuation").  True, the Mustang was still in the officers' custody at the time Elmore spoke to his stepmother.  But his incriminating reactions during that conversation had nothing to do with the *length* of time the vehicle was detained.  Rather, his concern was whether, months earlier when the Mustang was initially seized, his stepmother had provided officers with the vehicle's key fobs.  *See Wong Sun*, 371 U.S. at 487–88 (focusing the attenuation inquiry on whether the "primary taint" has been purged from the challenged evidence).

The next attenuation factor, the presence of intervening events, also favors the government.  Notably, Elmore relies on at least three intervening events—the equivalent of a constitutional triple bank shot—to link the allegedly illicit searches to the memory card's discovery:

(1) Elmore's stepmother chose to tell Elmore about the investigation;

(2) Elmore suspiciously inquired into whether officers had the Mustang's key fobs; and

(3) Elmore's stepmother sought out the officers, providing them the key fobs, and suggesting that they search them for child pornography.

These events were independent actions, the product of either Elmore's or his stepmother's free will.  *See Wong Sun,* 371 U.S. at 486 (recognizing that an "act of free will" can be sufficient to "purge the primary taint" of the Fourth Amendment violation).  And in the case of evidence obtained through third-party consent, suppression is required only where the "causal link" between the unlawful search and the third party's action is "so tight" as to "significantly influence[]" the third party's decision.  *See United States v. Cordero-Rosario*, 786 F.3d 64, 76 (1st Cir. 2015); *see also United States v. Meece*, 580 F.3d 616, 619 (7th Cir. 2009); *see generally* 4 Wayne R. LaFave, *Search and Seizure* § 8.2(d) (6th ed. 2020) (suggesting that evidence obtained through a consent search will be untainted where the consent occurs after a fruitless

search, at a later date than the initial search, or if the consent was unsolicited). That does not describe the situation here, where Elmore's stepmother's decision to turn over the key fobs to officers was her decision alone, removed from any official influence. *See Meece*, 580 F.3d at 620 (7th Cir. 2009) (holding that evidence obtained through third party consent need not be suppressed if the consent was the product of third party's private concerns); *cf. United States v. Finucan*, 708 F.2d 838, 844 (1st Cir. 1983) (finding error when there was no indication that third parties would have come forward on their own absent information obtained from an illegal search).

The final attenuation factor also favors the government. Exclusion is favored "when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 136 S. Ct. at 2063. Yet the errors Elmore highlights concern the warrants being imprecise or lacking detail, or the length of the Mustang's seizure. At worst, these are good faith mistakes by the officers, *id.*, not nefarious attempts to influence Elmore's stepmother. After all, not even Elmore contends that the officers could have predicted their efforts would result in a third party volunteering incriminating evidence. *See United States v. Delancy*, 502 F.3d 1297, 1312–14 (11th Cir. 2007) (examining the purpose and flagrancy prong in a third-party consent case in terms of whether the police misconduct was "made for the purpose of gaining consent"). As a result, little in the way of deterring officer misconduct is gained by suppressing evidence in this setting. *See id.* at 1314 ("[W]hen, acting in good faith, police obtain the knowing, intelligent, and voluntary consent of a third party without exploiting their unlawful [conduct] in any way, the purposes of the exclusionary rule would not be served by excluding valuable evidence.").

*United States v. Cordero-Rosario* is of no help to Elmore. There, the First Circuit vacated a conviction for child pornography possession that hinged on evidence the defendant's wife freely provided to federal agents as part of a consent-based search. 786 F.3d at 66–67, 78. And on remand, the district court concluded that the evidence provided by Cordero-Rosario's wife was tainted by an earlier unlawful search. 252 F. Supp. 3d 79, 94 (D.P.R. 2017). But compare that case to this one. There, the unlawful search yielded useful information to officers (the defendant's possession of child pornography), occurred "just six days" before the consent

search, was uninterrupted by any intervening circumstances, and was accompanied by evidence that federal officers were knowingly acting upon the fruits of the earlier illegal search. *Id.* at 89–92. Here, on the other hand, the challenged conduct bore no fruit, occurred months before police acquired the memory card through a series of independent intervening acts, and was not exploitive in nature.

At bottom, Elmore's argument ultimately rests on his view that his stepmother's actions were the "tainted *consequences* of law enforcement's unlawful searches and seizures." *See* Appellant's Br. at 30. Put another way, he believes the allegedly deficient searches and seizures were a "but for" cause of the officers obtaining the memory card. But the Supreme Court has repeatedly held that evidence does not become fruit of the poisonous tree "simply because 'it would not have come to light but for the illegal actions of the police.'" *See Segura v. United States*, 468 U.S. 796, 815 (1984); *see also Hudson*, 547 U.S. at 592. Here, the purported Fourth Amendment violation bore no information or evidence, was divorced from the memory stick's discovery by time, intervening evidence, and independent third-party acts, and was not the product of exploitive police conduct. Accordingly, there is no basis to suppress the evidence.

B. Elmore next argues that, even if the initial improper searches do not require suppression, that remedy is independently required because the affidavit supporting the later search of the key fobs did not establish probable cause. Probable cause, however, is not a "high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It merely requires that an affidavit show a "fair probability" that criminal evidence will be found in the place to be searched. *See United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018) (quoting *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009)). On review, we pay great deference to the issuing judge, *see United States v. McLevain*, 310 F.3d 434, 439 (6th Cir. 2002), and ask only whether the judge had a "substantial basis" for finding probable cause, *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation omitted).

The affidavit here passes constitutional muster. After noting Elmore's prior conviction for possessing child pornography and the ongoing investigation into his recent conduct, the affidavit identifies two pieces of information that, taken together, establish a fair probability that child pornography would be found on the key fobs. First, the affidavit recounts information

from Elmore's stepmother regarding Elmore's unusual and "very concerning" reaction to learning that officers had possession of his car and key fobs. *See United States v. Hodge*, 714 F.3d 380, 384–85 (6th Cir. 2013) (observing that statements of named informants are "generally sufficient to establish probable cause"). Second, it details the affiant's training and experience with similar investigations, his prior experience with Elmore, and his observation that it was "not uncommon for suspects to hide . . . electronic devices" containing child pornography. *See United States v. Reed*, 993 F.3d 441, 452 (6th Cir. 2021) (holding that an officer's training and experience about where criminals keep contraband is relevant in conjunction with other information to the probable cause determination).

Elmore offers three responses. He first contends that his reaction to his stepmother's mention of the seized Mustang was not "unusual," and thus could not establish probable cause. But his stepmother specifically described Elmore's distressing reaction concerning the key fobs, not the car, during their conversation. And that, along with Elmore's past behavior and the affiant's training and experience, established a fair probability that the key fobs would contain evidence of a crime. *See United States v. Allen*, 211 F.3d 970, 972–73 (6th Cir. 2000) (en banc) (citing *Gates*, 462 U.S. at 236, 246 n.14) (explaining that we assess a warrant affidavit not by looking at information in isolation but by considering the totality of the circumstances presented to magistrate).

Second, Elmore faults the affidavit's mention of the inmate's tip, which, according to Elmore, was both dated and proved false, in that officers did not find child pornography hidden in the Mustang. True enough, the inmate's tip was not directly fruitful and did not mention the key fobs. But that background information did not undermine other evidence indicating a fair probability that contraband would be found on the key fobs.

Finally, Elmore argues that the affidavit failed to establish a nexus between the *specific* key fob being searched and the evidence sought. Yet that framing sets the probable cause bar too high. We do not require an "exacting degree of specificity" for warrant affidavits, *United States v. Christian*, 925 F.3d 305, 310 (6th Cir. 2019) (en banc), such as identifying the exact room or drawer containing the contraband. Rather, we require only a fair probability that contraband will be found in a particular place. *Gates*, 462 U.S. at 238. Given Elmore's odd behavior regarding

the key fobs, his history with child pornography, and his known tendency to hide that material in electronic devices, the totality of the circumstances suggest that incriminating information would be found on at least one of Elmore's three fobs. *See United States v. Wagers*, 452 F.3d 534, 539 (6th Cir. 2006) (finding nexus requirement satisfied where evidence of child pornography could logically be tied to one of two locations identified in the search warrant).

C. Elmore closes his appeal by arguing that the district court should have afforded him a *Franks* hearing to allow him to further challenge the material included in the third search warrant affidavit. While the government, we note, does not directly address Elmore's argument on appeal, Elmore cites no case law showing that any supposed forfeiture by the government relieves him of his "heavy burden" of showing that a *Franks* hearing was necessary. *See United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017); *see generally United States v. Montgomery*, 998 F.3d 693, 698 (6th Cir. 2021) (observing that forfeiture is the "passive failure to make a timely assertion of a right").

A *Franks* challenge is appropriate only where an affiant deliberately or recklessly disregarded the truth by including false information or a material omission that is necessary to the probable cause finding. *See Young*, 847 F.3d at 348–49. Elmore says the affidavit "mischaracterizes" his stepmother's conversation with officers, but he ultimately fails to make such a showing. *See United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013) (holding that where the "substance" of the information in a warrant affidavit is true, no *Franks* hearing is required). For example, Elmore protests that his stepmother never said that his "attitude changed" when she mentioned the Mustang's seizure, but her recorded interview shows that she told officers that Elmore "got quiet" before asking her a series of questions about the key fobs, signaling the matter was "very important to him" and raising her "concern[s]." Nor, as Elmore suggests, did the affidavit falsely indicate that his stepmother came to a firm conclusion about what Elmore's comments about the key fob meant.

Elmore's remaining arguments are similarly unavailing. Even if, as Elmore contends, the affiant deliberately omitted the fact that the storage unit search did not yield any incriminating information, he fails to explain why that largely unrelated search would cast doubt on the likelihood that contraband would be found on the key fobs. Elmore also suggests that the third

warrant omitted information calling into question the prison informant's credibility. But again, the informant merely offered background information not essential to the specific probable cause finding established by the warrant to search the fobs. At day's end, even if all of these supposed mischaracterizations and omissions were addressed in the warrant affidavit, they would not alter the determination of a fair probability that child pornography would be found in the key fobs. There was thus no need for a *Franks* hearing. *See Franks*, 438 U.S. at 171–72.

## CONCLUSION

Because the district court did not err in denying Elmore's suppression motions, we affirm the judgments of the district court.