**UNITED STATES of America,**
Plaintiff,

v.

**Hilton CORDERO–ROSARIO,**
Defendant.

**CASE NO. 11–556 (GAG)**

United States District Court,
D. Puerto Rico.

Signed 05/18/2017

Marshal D. Morgan, San Juan, PR, Attorney(s) for Plaintiff.

Jose L. Nieto–Mingo, San Juan, PR, Attorney(s) for Defendant.

## OPINION AND ORDER

GUSTAVO A. GELPI, United States District Judge

### I. Background

On February 1, 2013, defendant Hilton Cordero–Rosario ("defendant "or "Cordero–Rosario") entered into a conditional agreement in which he pleaded guilty to count 21 of the superseding indictment charging him with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). (Docket No. 80.)[1] Per the

---

1. Counts 1–20 of the superseding indictment charged Cordero–Rosario with production of

terms of said agreement, Cordero–Rosario reserved the right to challenge on appeal the Court's order denying his motion to suppress. Id. The Court sentenced Cordero to one hundred and twenty months imprisonment, the statutory maximum, followed by fifteen years of supervised release. (Docket No. 114.)

Cordero–Rosario subsequently appealed the Court's denial of his motion to suppress in which he moved to exclude all evidence seized from the two searches conducted by the Puerto Rico Police Department ("PRPD"), as well as the evidence that stemmed therefrom. The First Circuit vacated the Court's suppression ruling and remanded the case back to this Court. The appellate court found that the searches that took place on February 4 and February 26 were invalid because they lacked probable cause, thus violated Cordero–Rosario's Fourth Amendment Rights. See United States v. Cordero–Rosario, 786 F.3d 64, 68–72 (1st Cir. 2015). The court, however, remanded the matter for a hearing and determination on whether evidence obtained pursuant to the consent of defendant's former spouse was tainted by the prior unlawful searches. Cordero–Rosario, 786 F.3d at 77.

In light of the First Circuit's ruling, the Court must determine which evidence, if

any, is tainted by the prior unlawful PRPD searches, pursuant to the "fruit of the poisonous tree" doctrine and the taint/attenuation test articulated in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and United States v. Finucan, 708 F.2d 838 (1st Cir. 1983). Cordero–Rosario, 786 F.3d at 77.

Following remand, the Court ordered the government to inform if it had independent evidence to present its case. (Docket No. 129.) The Government in turn, listed the following evidence: A) images and other evidence found in the family desktop computer, to support Counts 1–20 of the Superseding Indictment (Production of Child Pornography), and Count 21 of the Superseding Indictment (Possession of Child Pornography); B) evidence obtained from the 320 GB Western Digital external hard drive, with serial number WMAM1543470 (hereinafter "320 GB External Hard Drive"), to support Count 22 of the Superseding Indictment (Possession of Child Pornography); and C) the live testimony of the then minor involved, referred throughout this Opinion as MMTH.[2]

The undersigned referred the pending admissibility issues to Magistrate Judge Silvia Carreño–Coll for a hearing and Report and Recommendation.[3] (Docket No. 143.) A suppression hearing was held on

---

child pornography, in violation of 18 U.S.C. § 2251(a). Counts 21–22 charged him with possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). (See Docket No. 29.) Per the terms of the conditional plea agreement, the Government agreed to dismiss the production of child pornography charges, and count 22. (Docket No. 80.)

2. While the admissibility issue was pending before the Court, the government, on July 7, 2016, a federal grand jury returned a Second Superseding Indictment charging the defendant with one count of Sex Trafficking of a Minor, in violation of 18 18 U.S.C.§ 1591(a), and one count of Possession of Child Pornography, in violation of 18

U.S.C.§ 2252(a)(4)(B). The Possession of Child Pornography count, Count 2 of the Second Superseding Indictment, is based on the defendant's possession of the same sexually explicit images included in Count 22 of the Superseding Indictment that were found on the 320 GB External Hard Drive. See Docket No. 173.

3. On November 8, 2016, while the Report and Recommendation was still pending, Defendant Hilton Cordero filed an "Urgent Motion Requesting Release Pending Resolution of Motion to Suppress." (Docket No. 183.) The Government opposed. (Docket No. 189.) Defendant's Motion requesting relief is also pending.

April 13, 2016 before Judge Carreño–Coll.[4] (Docket No. 161.) The Government presented the following witnesses: Agent Rebecca González Ramos, Agent Lillian Agudelo, Deborah Martorell and Idalia Hornedo, MMTH's mother.

Defendant Cordero–Rosario submitted to the Court his legal arguments after the hearing, in writing. (Docket No. 164.) The Government responded. (Docket No. 165.) Judge Carreño–Coll issued her report and recommendation, which is discussed in full below. (Docket No. 191.) Defendant Cordero–Rosario objected.[5] (Docket Nos. 192 & 208). The Government responded in opposition to Cordero–Rosario's objections. (Docket No. 205.) Per leave of Court, Cordero–Rosario replied. (Docket No. 210.)

## II. The Report and Recommendation

Judge Carreño–Coll recommends the suppression of the evidence obtained as a result of the computer search executed pursuant to the consent of defendant's former spouse, Deborah Martorell. As to the remaining evidence—320 GB External Hard Drive, the live testimony of MMTH and the Sony CyberShot Camera—she recommends admission. (Docket No. 191.)

The undersigned **ACCEPTS and ADOPTS**, Magistrate Judge Carreño–Coll's factual findings and legal conclusions regarding the suppression of evidence obtained as a result of the computer search, pursuant to Martorell's consent. (Docket No. 191 from 33 to 38.) Accordingly, the evidence found during the search of the family computer during the "federal investigation"—including the sexually explicit images of MMTH, and chat conversations

between Cordero and MMTH contained therein—are suppressed.

Due to the fact-intensive nature of the issue before the Court, Judge Carreño–Coll shrewdly pieced together, in chronological order, the events relevant to Cordero–Rosario's Suppression. The undersigned **ADOPTS** the findings of fact in Judge Carreño–Coll's Report and Recommendation. (See Docket Nos. 191 from 9 to 27.) The Court will not retell the story, only the facts relevant to the Court's *de novo* review will be discussed.

Cordero–Rosario objects to the Report and Recommendation, arguing that the 320 GB External Hard Drive and MMTH's live testimony are tainted and therefore must be suppressed. Specifically, Cordero–Rosario argues that the record does not support the conclusion that the circumstances that led up to the discovery of the 320 GB External Hard Drive present ample indicia of attenuation from the initial taint. (Docket No. 201 at 6.) He raises the same argument as to MMTH's testimony. Id.

In response to Cordero–Rosario's objection, the Government argues that Martorell's testimony evinces the existence of intervening circumstances that were strong enough to break the chain and purge the taint of the initial illegality. (Docket No. 208.) The Government posits Martorell's decision to voluntarily surrender the 320 GB External Hard Drive can only be understood to be the product of her detached reflection and a desire to be cooperative with federal law enforcement authorities. Further, the Government notes that in her testimony, Martorell explained that her decision to turn over the

---

4. The defendant was present in court, under custody. (Docket No. 161.)

5. Cordero–Rosario first raised his preliminary objections in which he requested the preparation of the Suppression hearing transcript to

adequately object the Magistrate Judge's factual findings. (Docket No. 192.) The Court ordered the preparation of the transcripts and gave the parties additional time to supplement their objections with the transcript of the hearing. (Docket No. 193.)

hard drive "was driven by a sincere desire to see if there were any more victims of the defendant and to confirm the allegations that were raised by her daughter PCM prior to the PRPD searches." (Docket No. 208 at 13.) Hence, "her primary concern was that her daughter not be labeled a liar for having had the courage to come forward with allegations of sexual misconduct by her father; an interest and motivation that predates, and is otherwise unrelated to, the tainted PRPD searches." Id.

Upon Cordero–Rosario's objections, the Court reviews *de novo* the Magistrate Judge's factual findings and legal conclusions regarding the admissibility of the 320 GB External Hard Drive and the testimony of MMTH.

## III. Standard of Review

The Court may refer motions to suppress to a United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). See FED. R. CRIM. P. 59; see also L. Crim. R. 159; Mathews v. Weber, 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). An adversely affected party may contest the report and recommendation by filing its objections. FED. R. CRIM. P. 59. Moreover, 28 U.S.C. § 636(b)(1), in pertinent part, reads as follows:

> [A]ny party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

"Absent objection, ... [a] district court ha[s] a right to assume that [the affected party] agree[s] to the magistrate's recommendation." Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir. 1985). Additionally, "failure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objections are precluded upon appeal." Davet v. Maccarone, 973 F.2d 22, 30–31 (1st Cir. 1992); see Henley Drilling Co. v. McGee, 36 F.3d 143, 150–51 (1st Cir. 1994) (holding that objections are required when challenging findings actually set out in a magistrate's recommendation, as well as the magistrate's failure to make additional findings); see also Lewry v. Town of Standish, 984 F.2d 25, 27 (1st Cir. 1993) (stating that "[o]bjection to a magistrate's report preserves only those objections that are specified"); Borden v. Sec. of H.H.S., 836 F.2d 4, 6 (1st Cir. 1987) (holding that appellant was entitled to a *de novo* review, "however he was not entitled to a de novo review of an argument never raised"); see FED. R. CRIM. P. 59(d).

## IV. Legal Analysis

The Court must determine which evidence, if any, is tainted by the unlawful PRPD searches. In doing so, the Court must define the outer limits of contamination following an illegal search.

Magistrate Judge Carreño–Coll ultimately concluded that the police obtained Martorell's consent to search the family computer by exploitation of the illegality:

> When she gave consent, Martorell had already seen some of the images that were in the unlawfully seized computer. What is more, she had seen those crude images scarcely a month before she signed the consent form. The close temporal proximity between viewing the pictures and granting consent leads this court to the conclusion that the impression of seeing those pictures was fresh in her mind.
>
> Martorell's emotional testimony confirms it. She described how, when she

saw the pictures, she kept asking herself whether there could be pictures of her daughter or other victims in there. She also related how she went home after the meeting with the state prosecutors and began to go frantically through Cordero's belongings. It seems that whereas before, Martorell could have harbored doubts as to the extent of Cordero's action–which might explain why she did not come forward previously–seeing those pictures provided confirmation.

(Docket No. 191 at 34–36.) The undersigned agrees with the Magistrate Judge's finding that "Martorell's mental state was deeply influenced by the images that she had seen, the images that had been illegally obtained by the PRPD." (Docket No. 191 at 36.) Consequently, Judge Carreño–Coll concluded that "Martorell's consent flowed directly from the original unlawful search that yielded the images and cannot be said to be the result of 'detached reflection.'" Id. at 37 (quoting State of Iowa v. Lane, 726 N.W.2d 371, 386 (Iowa 2007)).

The Court adopts Magistrate Judge Carreño–Coll's finding that Martorell's consent was obtained in exploitation of the illegality, thus, the "federal investigation" stemmed from the investigation led by local authorities. Judge Carreño–Coll found that the Lane factors "inexorably lead[ ] to the conclusion that the taint was not attenuated." (Docket No. 191 at 38). Consequently, she concluded that Martorell's consent was tainted by the prior unlawful searches. Id. As a result of this finding, "it follows that the evidence obtained as a result of the subsequent search of the computer conducted by the federal agents must be excluded." Id.

### A. Applicable Law and First Circuit's Mandate

The First Circuit's pellucid mandate traces the path for the Court on remand. "[I]f the District Court should find that the Puerto Rico police's unlawful searches did not taint the federal authorities' consent-based search, then the District Court must decide which, if any, of the government's evidence stemmed solely from the Puerto Rico police's searches." Cordero–Rosario, 786 F.3d at 78. On the other hand, if the Court rules that unlawful searches tainted the federal investigation, "then the District Court must decide which, if any, evidence the government seeks to introduce must be suppressed in consequence of that tainted relationship." Id.

 The question whether evidence obtained after an illegal search should be suppressed as the fruit of the poisonous tree depends upon *"whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."* Finucan, 708 F.2d at 843 (quoting Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (internal quotation marks omitted) (emphasis added). "Such an analysis depends primarily upon weighing the facts in the particular case, and is thus a matter especially suitable for resolution by the district court." Id. "The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." Cordero–Rosario, 786 F.3d at 75–76 (quoting Brown, 422 U.S. at 609, 95 S.Ct. 2254 (Powell, J. concurring)).[6]

**6.** Under the exclusionary rule, evidence obtained during a search may be tainted by the illegality of an earlier Fourth Amendment violation, "so as to render such evidence inadmissible as 'fruit of the poisonous tree.'" United States v. D'Andrea, 648 F.3d 1, 6 (1st Cir. 2011) (quoting Wong Sun, 371 U.S. at 488, 83

The Supreme Court in <u>Brown</u> spelled the following factors relevant to the taint/attenuation analysis: (1) the time that elapsed between the underlying illegality and the later acquisition of the evidence at issue; (2) the presence or absence of intervening circumstances between those points in time; and (3) the purpose and flagrancy of the official misconduct in question. <u>Brown</u>, 422 U.S. at 603–04, 95 S.Ct. 2254.

▪ "[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." <u>United States v. Camacho</u>, 661 F.3d 718, 728–29 (1st Cir. 2011) (quoting <u>New York v. Harris</u>, 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990)). Moreover, "[s]uppression is not appropriate, ... if 'the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" <u>Camacho</u>, 661 F.3d at 728–29 (quoting <u>Segura</u>, 468 U.S. at 804, 104 S.Ct. 3380 (quoting <u>Nardone v. United States</u>, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)).

In <u>Cordero–Rosario</u>, the First Circuit distinguished this case from <u>Brown</u> and <u>United States v. Navedo–Colón</u>, 996 F.2d 1337 (1st Cir. 1993), which presents the classic scenario in which a defendant seeks to suppress his own confession made after an unlawful search or seizure. 786 F.3d at 76. Here, Cordero–Rosario is seeking to suppress evidence obtained pursuant to consent supplied not by himself but by his then-wife—a third party. <u>Id.</u>

In <u>Finucan</u>, the appeals court deemed dispositive factors: 1) whether absent the illegal search, "the investigators [would] have known the identity of all of the third parties [or] what to ask them.' In that regard, we considered whether 'the government anticipated that the illegal search would help lead it to the other dealers and documents'" and; 2) whether "'third parties would have come forward on their own had the investigators not sought them out.'" <u>Cordero–Rosario</u>, 786 F.3d at 77 (quoting <u>Finucan</u>, 708 F.2d at 844) (internal citations omitted) (alteration in original).

After discussing <u>Brown</u> and <u>Finucan</u>, the First Circuit concluded that "[t]he success of Cordero's suppression motion turns on whether the evidence obtained pursuant to [Martorell's] voluntary consent was tainted by the prior unlawful searches by the Puerto Rico police," and recognized the that this inquiry is "highly fact dependent and "amorphous.'" <u>Id.</u> To this end, the First Circuit expressly outlined the factors the court should consider when conducting the attenuation analysis of evidence acquired by third-party consent.[7]

S.Ct. 407) (internal quotation marks omitted); <u>see also</u> <u>Camacho</u>, 661 F.3d at 728–29.

The exclusionary rule not only contemplates the primary evidence "obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree." <u>Camacho</u>, 661 F.3d at 728 (internal citations omitted); <u>see also</u> <u>Segura v. United States</u>, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (explaining that the exclusionary rule "'extends as well to the indirect as the direct products' of unconstitutional conduct") (quoting <u>Wong Sun</u>, 371 U.S. at 484, 83 S.Ct. 407.) "In a similar vein, the Supreme Court has suggested that the key inquiry in cases seeking to suppress the indirect fruits of prior illegal law enforcement conduct concerns "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." <u>Cordero–Rosario</u>, 786 F.3d at 76.

7. "[U]nlike in <u>Navedo–Colón</u>, [t]he fact that the prior unlawful searches by the Puerto Rico police led the federal authorities to a third party who then consented does not in and of itself show that the taint and exploitation concern simply disappears from view, as our decision in <u>Finucan</u>, shows." <u>Cordero–</u>

786 F.3d at 78. The Court may consider the Finucan factors as well as the Brown factors, "which courts have applied in cases involving motions to suppress allegedly tainted evidence acquired pursuant to third parties granting consent to searches." Cordero–Rosario, 786 F.3d at 77 (internal citations and quotations omitted); see also United States v. Hill, 649 F.3d 258, 267–68 (4th Cir. 2011); Lane, 726 N.W.2d at 380–92 (discussing numerous considerations in addition to the Brown factors in fruit of the poisonous tree case involving third-party consent) (some internal citations omitted). Finally, the Court concluded that "[b]alancing these factors will illuminate the extent of attenuation in this case, and, along with it, the deterrence value of excluding evidence derived from [Martorell's] consent." Cordero–Rosario, 786 F.3d at 77–78.

### B. 320 GB External Hard Drive

██ Per the First Circuit's mandate, the Court now turns to the attenuation/taint analysis of the 320 GB External Hard Drive. For purposes of the attenuation/taint analysis, the Court summarizes only the relevant facts. Then, the Court weighs the Brown and Finucan factors, along with the deterrence value of the exclusionary rule based on the relevant factors of this case.

Magistrate Judge Carreño–Coll found that the 320 GB External Hard Drive was not tainted by the illegal PRPD searches and therefore, the External Hard Drive should not be suppressed. Cordero–Rosario objects to this finding. Id. Specifically, Cordero–Rosario contends that Martorell's decision to turn over the external hard drive was not an act of volition sufficiently withdrawn from the initial illegality, thus he argues, said evidence is tainted by the prior illegal search. (Docket No. 201.) He further argues that, because the external

hard drive first came up during the April 15, 2011 meeting—the meeting where Martorell consented to the search of the family computer that Magistrate Judge Carreño–Coll found to be tainted by the initial illegality—the record does not support the finding of ample indicia of attenuation enough to break the chain and purge the taint. (Docket No. 201 at 7.)

Key to the Court's attenuation/taint analysis of the 320 GB External Hard Drive is Martorell's April 15, 2011 meeting with federal authorities and the events that took place after. As part of the local investigation that took place during March 2011, Martorell met with state prosecutors and was shown explicit images, which had been obtained through the illegal searches conducted by the PRPD. Local agents also told Martorell that they were going to contact federal authorities. Less than a month later, Martorell was contacted by Agent Lillian Agudelo, a Special Agent with Homeland Security Investigations, Cyber Crimes Group. Agudelo asked Martorell if they could meet. On April 15, 2011, Martorell met with Agent Agudelo and Agent Pacheco at the ICE offices in San Patricio. At the Suppression Hearing, Agent Agudelo testified that the purpose of the meeting was to obtain Martorell's consent to search the family computer that had been previously searched by the local authorities. Martorell signed the consent form. After signing the consent form, Martorell informed Agudelo that there were other devices at her house that were left behind by the local authorities. She offered these to Agudelo so that they could be searched as well. (Docket No. 194 at 87.)

Q. Do you recognize this?

A. Yes.

Q. And what is this document?

Rosario, 786 F.3d at 76–77 (internal citations omitted) (alterations in original).

A. That's the document that I signed that day.

Q. This is your signature down below?

A. Yes.

Q. And this second page here, explain to us what that is.

A. There, in writing, that I'm authorizing, that I'm giving all my consent for the computer of the home to be investigated. And that the information that the computer was used by the family, and that it didn't have a password.

Q. Did anybody force you to sign this consent?

A. No.

Q. Did anybody make you any promises in exchange for signing this consent?

A. No. The opposite. I wanted the Federal investigation.

Q. Why?

A. Because for transparency, I wanted them to look for more. When I saw those pictures of my neighbor, I asked myself, are there pictures of my daughter? Is there any other victim? And trust. I mean, if it was a Federal investigation, I trusted that investigation because of all the things that were happening with the investigation with my daughter. I mean, I wanted to be sure. I wanted everything—I wanted to get to the end of this. I wanted a serious investigation.

Q. After signing that consent, what, if anything, did you discuss with Agent Agudelo?

A. I told her that there were also several things at the home, because since he built the computer, all the parts that were left over from building the computer were there, in addition to the old phones that were there.

And since I also didn't know about the parts of the computer, I wanted her to go there to check on it, to look at it and take anything—if it was necessary, for her to take anything, in case there was more material there.

Q. What effect, if any, did the fact that the locals had found child pornography have on your decision to turn over the equipment to the Federal authorities?

A. The investigation, I wanted them to investigate, to look in the computer. That the state authorities had found something, okay. Yes. But I wanted to know if there was anything more.

Q. What is it that you wanted them to investigate?

A. The contents. All the contents. I want them to get to the bottom, to wherever they were going to go. But I wanted the investigation to occur.

(Docket No. 194 at 43–44.) A few days after the meeting at ICE in San Patricio, Agent Agudelo called Martorell to follow up on the additional electronic devices she mentioned and offered to hand over to the federal authorities. Agent Agudelo instructed her to put the items together and said she would pick them up. On April 21, 2011—just 6 days after the meeting at ICE—Agent Agudelo went to Martorell's residence to pick up the devices. Martorell had organized them on the dining room table, as he had instructed. Among these items was the 320 GB External Hard Drive. Agudelo took the External Hard Drive and several other electronic devices.

At the suppression hearing, Agent Agudelo testified that Martorell's demeanor was telling of her willingness to cooperate. She wanted to help the investigation "find the truth." (Docket No. 194 at 94.) Martorell testified that it was her desire help the federal authorities investigate further the

findings of the local investigation. Using Martorell's own words, she wanted the federal authorities "to get to the bottom" of what the local authorities had illegally obtained. Martorell also testified that, because of Cordero–Rosario's position in the San Juan Municipal Police, she was concerned as to the integrity of the local investigation and that Defendant's position with the San Juan Municipal Police could influence the investigation.

### i. Temporal Proximity

The close temporal proximity between viewing the pictures, granting consent and turning over the electronic devices weighs in the defense's favor. As reasoned by Magistrate Judge Carreño–Coll, Martorell's emotional testimony is telling of how greatly influenced she was with "the impression of seeing those pictures which showed that they were still fresh in her mind." (Docket No. 191 at 35.) Both Martorell's consent and her voluntary proffer of the electronic devices took place simultaneously, during her April 15 meeting at ICE.

### ii. Intervening Circumstances

▮▮▮ "[I]n determining whether intervening circumstances may have purged the taint of a prior illegality, we look not at the defendant's conduct, but rather at intervening event[s] of significance that render inapplicable the deterrence and judicial integrity purposes that justify excluding tainted evidence." United States v. Washington, 387 F.3d 1060, 1073–74 (9th Cir. 2004) (citing United States v. Perez–Esparza, 609 F.2d 1284, 1289, 1290 n. 3 (9th Cir. 1979); see also Dunaway v. New York, 442 U.S. 200, 218, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); United States v. Ricardo D., 912 F.2d 337, 343 (9th Cir.1990). "Intervening circumstances that militate in favor of attenuation must be sufficiently important to ensure that potentially tainted evidence was 'come at by way of' some process other than the exploitation of an illegal search." Washington, 387 F.3d at 1074 (citing Wong Sun, 371 U.S. at 487–88, 83 S.Ct. 407).

Magistrate Judge Carreño–Coll found intervening circumstances between the illegality and Martorell's voluntary turnover the electronic devices sufficient to render her action "an act of volition sufficiently withdrawn from the original illegality." (Docket No. 191 at 39.) The intervening circumstances being: 1) the Agents had no prior knowledge of those other devices of their contents, 2) the fact that six days elapsed between the meeting with Agudelo and the actual turnover of the devices and Martorell did not change her mind, and 3) that she even "took on the task of gathering the gadgets and organizing them on the kitchen table." Id. at 39–40. For these reasons, she concluded that Martorell's "actions are indicative of the detached reflection and a desire to be cooperative described in Lane." (Docket No. 191 at 40.)

The undersigned finds it difficult to distinguish Martorell's signing of the consent form with her decision to turn over the external hard drive. Agent Agudelo called Martorell to accept the devices she had offered. As a result—just six days after giving consent—Martorell put her words into action, and organized the devices, per Agudelo's instructions. The post-consent events do not rise to the level of "intervening circumstances" sufficient to break the chain and purge the taint. The mere passing of six days and her affirmative actions were still linked to the original illegality and cannot be deemed, in this case, a product of her detached reflection. Martorell's testimony proves that, at that moment, her mental state was still influenced by the illegally obtained pictures. As a result of that influence, Martorell was, essentially, following orders.

As Magistrate Judge Carreño–Coll correctly concluded, "Martorell's consent

flowed directly from the original unlawful search that yielded the images and cannot be said to be the result of 'detached reflection.'" (Docket No. 191 at 37) (quoting Lane, 726 N.W.2d at 386). Relevant to the Court's analysis is the deep psychological injuries that are a natural consequence of the facts of this case, specifically by Martorell's mental state after enduring the agonizing task of seeing the crude pictures obtained by the PRPD. When discussing her conclusion that Martorell's consent was obtained by exploitation of the illegality, Magistrate Judge Carreño–Coll reasoned that: "As in Finucan, the agents banked on the illegally obtained evidence in guiding their investigation, at least in the beginning. Relying on the Wong Sun rationale, ... the police obtained Martorell's consent by exploitation of the illegality." (Docket No. 191 at 34.) "When she gave consent, Martorell had already seen some of the images that were in the unlawfully seized computer. What is more, she had seen those crude images scarcely a month before she signed the consent form." Id. at 35. "It follows that, Martorell's mental state, at the moment she offered the electronic devices, was also deeply influenced by the images that she had seen, the images that had been illegally obtained by the PRPD." Id. at 35.

As such, the Court finds no intervening circumstances between the illegal searches and Martorell's turnover of the 320 GB External Hard Drive thus, that would render it "sufficiently an act of free will to purge the primary taint of the unlawful invasion." Perez–Esparza, 609 F.2d at 1289.

### iii. Purpose and flagrancy of the official misconduct

■■■ "The exclusionary rule exists to deter police misconduct. *The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of*

*deterrence—that is, when it is purposeful or flagrant.*" Utah v. Strieff, —— U.S. ——, 136 S.Ct. 2056, 2063, 195 L.Ed.2d 400 (2016) (citing Davis v. United States, 564 U.S. 229, 236–37, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011)(emphasis added)). This factor "is considered the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006). Purposeful and flagrant conduct exists when: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed "in the hope that something might turn up." Id. (quoting Brown, 422 U.S. at 605, 95 S.Ct. 2254.)

■■■ When evaluating the flagrancy of the conduct, there are numerous factors to consider. "Some factors may weigh in favor of finding the conduct to be flagrant including that the illegal conduct involves the physical entry of the home[,] [which] is the chief evil against which the wording of the Fourth Amendment is directed." Hill, 649 F.3d at 270 (internal quotations omitted). "Other factors may weigh in favor of finding the conduct was not flagrant, *including that the officers did not use or exploit the evidence that they obtained during the initial search to gain consent.*" Id. (emphasis added).

The parties dispute the source of the federal government's knowledge that child pornography found during the lewd acts investigation conducted by the PRPD. Agent González testified at the suppression hearing that she first heard about the child pornography material in the news. (Docket No. 194 at 27.) Cordero–Rosario, on the other hand, contends that Gonzalez became aware of the existence of child

pornography when she received a tip from the PRPD. (Docket No. 201 at 10.) During cross-examination, defense counsel confronted Gonzalez with a "Report of Investigation" from Martorell's May 16, 2011 interview. Judge Carreño–Coll deemed Gonzalez's version truthful. Gonzalez "explained that it is not customary to include in an ROI that an agent received information "from the news, even when that is the case." (Docket No. 191 at 14 n.11.) The undersigned gives deference to the Magistrate Judge's assessment of the witness' credibility and therefore adopts her finding of "Gonzalez' explanation to be truthful and have no reason to doubt that she, in fact, first heard about the child pornography materials through the news." Id.

Irrespective of the source of the information, Agent González testified that she contacted local prosecutors to verify the finding of child pornography material by the PRPD. She met with the local prosecutors and reviewed the search warrants. (Docket No. 191 at 15.) As soon as she reviewed the search warrants, she became concerned that these could be insufficient to search for child pornography. Id. Next, Agent González arranged a meeting with her supervisors and members of the United States Attorney's Office. (Docket No. 191 at 16.) The purpose of the meeting was to discuss her concerns regarding the state warrants. Then, they decided "to create an individual investigation away from the state and local search warrants." Id. "[I]t was decided that the federal agents would try to obtain Martorell's consent to search the computer that had been seized by the PRPD." Id.

Ironically, the "independent federal investigation" picked up where the PRPD left off. The close ties between the investigations manifests the flagrancy of the

federal authorities' investigation. Agent González and the United States Attorney's office designed and orchestrated what they believed to be an "independent federal investigation." Even though Agents Pacheco and Agudelo were not privy to the discussions by the federal authorities where they discussed the flawed PRPD investigation, when assigned to conduct the "independent federal investigation" they were given specific instructions by their superiors to get Martorell's consent to search the computer that the PRPD has seized. This decision evinces they were acting upon the fruits of the PRPD searches to guide their investigation.[8] In a like manner, Magistrate Judge Carreño–Coll reasoned that "[t]he mere creation of a 'taint team' is not enough to attenuate the initial taint" and pointed out that "[r]ather than initiating the independent investigation on a tabula rasa, Agudelo reached out to Martorell with the intention of getting consent to search the computer held by the PRPD." (Docket No. 191 at 34).

The Government strongly urges the Court not to accuse the federal agents of engaging in misconduct for carrying out a separate investigation, arguing that the "application of the exclusionary rule is a draconian measure that is geared towards "deterring lawless conduct by federal officers," and "closing the doors of the federal courts to any use of evidence unconstitutionally obtained." (Docket No. 208) (citing Brown, 422 U.S. at 599, 95 S.Ct. 2254.) As such, the Government argues against suppression because there is no "lawless conduct to deter." Id.

In no way is the Court condemning the Government's efforts to conduct an independent investigation. Nevertheless, the

---

**8.** "González gave specific instructions that the next step was to obtain consent. In fact, González admitted that, had they not gotten consent, they would have had to come up with an alternate plan." (Docket No. 191 at 34).

federal authorities should have steered with more caution rather than jump the gun. In Puerto Rico, as in many other jurisdictions, federal and state authorities work together to combat crime. All things considered, the Court finds that the flagrancy of the not-so-independent federal investigation constitutes the type of behavior the exclusionary rule aims to deter.

### iv. The Finucan Factors

As stated previously, "[t]he question whether evidence obtained after an illegal search should be suppressed as the fruit of the poisonous tree depends upon 'whether, granting establishment of the primary illegality, the evidence ... has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Finucan, 708 F.2d at 843 (quoting Wong Sun, 371 U.S. at 488, 83 S.Ct. 407.)

The first Finucan factor echoes the Court's discussion above. Absent the illegal search, would the investigators have known the identity of all of the third parties or what to ask? Did the government anticipate that the illegal search would help lead it to the other evidence? As analyzed in the Court's discussion of the third Brown factor (i.e., purposeful and flagrant police misconduct) the federal authorities used the PRPD's investigation for leads to guide their independent investigation.

The Court agrees with the Magistrate Judge's finding that "[a]s in Finucan, *the agents banked on the illegally obtained evidence in guiding their investigation, at least in the beginning.*" (Docket No. 191 at 34) (emphasis added). It is uncontested that the federal authorities used the PRPD investigation to map their own investigation and thus, they expected it would lead them to the unlawful material. Consequently, this factor weighs in favor of exclusion.

The second Finucan factor, "[w]hether 'third parties would have come forward on their own had the investigators not sought them out" also weighs in favor of exclusion. Martorell expressed—on multiple occasions—her desire to help the authorities. Finucan, 708 F.2d at 844. However, as Magistrate Judge Carreño–Coll pointed out, she did not do so until she was approached. "Even though Martorell emphasized that she wanted an independent federal investigation, the fact is that she did not come forward on her own." (Docket No. 191 at 34.) The fact that Martorell did not contact the authorities, having the opportunity to do so, but instead she waited for them to contact her supports the reasoning above as to the absence of intervening circumstances and that the federal authorities, by way of her involvement in the investigation, exploited the illegality.

██ Finally, the Court turns to the purpose of the exclusionary rule, deterrence. "The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." Brown, 422 U.S. at 599–600, 95 S.Ct. 2254 (internal citations and quotations omitted). "But despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." Brown, 422 U.S. at 600, 95 S.Ct. 2254 (internal citations and quotations omitted).

██ "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Davis, 564 U.S. at 237, 131 S.Ct. 2419. The Supreme Court has cautioned that the exclusionary rule "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress

the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.' " Id.

Having taken into account the totality of the circumstances, and after weighing the Brown and Finucan factors, the Court finds that the 320 GB External Hard Drive was not obtained by means sufficiently distinguishable, but rather by exploitation of the illegality. Consequently, the external hard drive is tainted by the prior unlawful searches and therefore, must be excluded. Regrettably, such determination comes at a high price insofar as "[t]he exclusionary rule generates substantial social costs, ... which sometimes include setting the guilty free and the dangerous at large." Hudson v. Michigan, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (internal citations and quotation marks omitted).

### C. MMTH's Live Testimony/ CyberShot Camera

The Court turns to the attenuation/taint analysis of the testimony of MMTH and the Cybershot Camera. When applying the exclusionary rule to live-witness testimony, a closer more direct link between the illegality and that kind of testimony is required. United States v. Ceccolini, 435 U.S. 268, 278, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

Magistrate Judge Carreño–Coll recommends MMTH's live testimony be admitted because pursuant to Ceccolini, "MMTH would have come forward, either on her own, or prompted by her mother." (Docket No. 191 at 42.) Magistrate Judge Carreño–Coll further reasoned that: "Hornedo's eagerness to reach out to federal authorities, which she displayed again during the hearing in this case by contacting the prosecutor and asking to testify out of her own will, is a testament to her disposition. The same can be said for MMTH." (Docket No. 191 at 42–43.)

An examination of these facts leads to the conclusion that those statements were the product of detached reflection and a desire to be cooperative. Ultimately, the record shows that the illegality which led to the discovery of MMTH did not play a significant part in her willingness to come forward.

(Docket No. 191 at 43.) Cordero–Rosario argues that the Magistrate Judge's finding is unsupported. (Docket No. 201.) The Government opposes this contention and argues that "MMTH's willingness to come forward is supported not only by the testimony of Idalia Hornedo, the minor's mother, but also by the testimony of Special Agent Agudelo who interviewed MMTH." (Docket No. 208 at 22.) Further, the Government argues that "MMTH freely and voluntarily agreed to be interviewed demonstrated her willingness to come forward and cooperate with the authorities. So voluntary and free was her cooperation that she alerted Agent Agudelo to the existence of the Sony Cyber Shot camera." (Docket No. 208 at 22.)

"The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." Ceccolini, 435 U.S. at 276–78, 98 S.Ct. 1054.

Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness

may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

Ceccolini, 435 U.S. at 276–78, 98 S.Ct. 1054. The circumstances that led to MMTH's involvement in the investigation follow.

When contacted by Agudelo, MMTH did not refuse to be interviewed and nothing on the record shows that her testimony was coerced in any way. In fact, while being interviewed, MMTH narrated unpleasant details about her interactions with Cordero and revealed that she possessed the camera where the seized pictures had been taken, information that was not known to the PRPD. Moreover, the interview with MMTH took place in May, three months after the PRPD had illegally seized Cordero's computer.

(Docket No. 191 at 42–43.) Relevant to the Court's consideration is the second Finucan factor, "[w]hether third parties would have come forward on their own had the investigators not sought them out." Finucan, 708 F.2d at 844. With this element, "the 'degree of free will' exercised by those who come forward and offer evidence entirely of their own volition" is of particular pertinence. Ceccolini, 435 U.S. at 276, 98 S.Ct. 1054; see also Garcia–Aguilar v. Lynch, 806 F.3d 671, 675 (1st Cir. 2015).

The undersigned agrees with Magistrate Judge Carreño-Coll's finding that MMTH would have come forward on her own, had she not been sought out by the authorities. The circumstances surrounding MMTH's involvement weigh strongly in finding that MMTH's live testimony was sufficiently attenuated from the initial illegality. (Docket No. 191 at 43.) The undersigned

adopts Magistrate Judge Carreño-Coll's factual findings and legal conclusions regarding the admissibility of MMTH's live testimony and the Sony Cybershot Camera.

## V. Conclusion

Upon *de novo* review, the Court **ADOPTS** Magistrate Judge Carreño-Coll's Report and Recommendation at Docket No. 191 consistent with this Opinion. For the foregoing reasons, **GRANTS IN PART and DENIES in part** the Government's "Motion in Compliance Explaining Why None of the Government's Evidence Should Be Suppressed" at Docket No. 135.

To sum up, the Court **SUPPRESSES and EXCLUDES:** 1) the evidence found during the search of the family computer during the "federal investigation"—including the sexually explicit images of MMTH, and chat conversations between Cordero and MMTH contained therein, and 2) the evidence obtained from the 320 GB External Hard Drive.

The Court **ADMITS:** 1) the live testimony of MMTH, and 2) the Sony Cyber Shot Camera.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

### SILVIA CARREÑO–COLL, UNITED STATES MAGISTRATE JUDGE

When does the taint end? Or can you un-poison the fruit? These are the questions I must answer in determining if the evidence obtained by the federal agents is tainted by the unlawful searches carried out by the police of Puerto Rico.

### I. Procedural Background

After being accused by the Commonwealth of Puerto Rico for lewd and lascivious acts against his daughter, Defendant

Hilton Cordero–Rosario was indicted at the federal level for production of child pornography. According to the 22–count indictment, Cordero persuaded, induced, enticed, and coerced a minor, to engage in sexually explicit conduct by producing photographs that showed the minor's genital areas and depicted her in sexual poses. Docket No. 3. Cordero was also charged with possession of child pornography for storing images depicting minors engaging in sexually explicit conduct in his desktop computer and in an external hard drive, in violation of 18 U.S.C. § 2252(a)(4)(B). *Id.* A superseding indictment was returned on January 18, 2012. Docket No. 29.

The computer containing the incriminating images had been seized by the Police of Puerto Rico ("PRPD") pursuant to a state search warrant obtained during the investigation into the lewd acts charges. A second search followed on February 25, 2012, where more electronic equipment was seized.[1]

On June 25, 2012, Cordero filed a motion to suppress all evidence seized during the two searches carried out by the PRPD at his residence and all evidence subsequently seized. The motion to suppress was denied without a hearing. Cordero eventually pled guilty to one count of possession of child pornography and a forfeiture allegation, but reserved the right to appeal the decision denying the suppression of the evidence. Docket No. 80. After sentencing, Cordero filed a notice of appeal to challenge the sentence imposed and the order denying the motion to suppress. *Id.*

The Circuit Court determined that the evidence seized by the PRPD must be excluded insofar as the warrants did not contain probable cause. The court remanded for the holding of an evidentiary hearing to establish if the evidence obtained by

the federal agents was also tainted and, therefore, subject to exclusion. Docket No. 125. In light of the First Circuit holding, the District Court ordered the United States to inform whether it would continue with the prosecution and if so, whether it had independent evidence to support the charges. Docket No. 129. The government responded and argued that it had independent evidence to support all the counts of the indictment. Docket No. 135. The defendant opposed. Docket No. 142.

The presiding Judge referred the motion at Docket No. 135 and the response at Docket No. 142, to the undersigned for a Report and Recommendation. Docket No. 143. A hearing was held on April 13, 2016. Docket No. 161. Prior to the hearing, the Defendant argued vehemently that the government had to itemize the evidence that it was going to advance as untainted. Docket No. 155. I determined that, in keeping with the spirit of the First Circuit's order, it was necessary to retrace the factual ins and outs of this case without the straightjacket that an itemization would impose. Docket No. 156. As such, the ample scope of the hearing allowed both parties to present extensive evidence that translated into post-hearing memoranda. Docket Nos. 164 and 165.

While the Report and Recommendation was pending, a second superseding indictment was returned against Cordero. Docket No. 171. The indictment includes a new count of sex trafficking of children.

On November, 2016, Cordero filed a motion for release from custody. Docket No. 183. As a result, the District Court ordered that Speedy Trial findings be included in the Report and Recommendation.

---

1. The hard drive, on the other hand, was recovered by federal agents in a subsequent search authorized by Hilton–Cordero's then-wife, Deborah Martorell.

## II. Speedy Trial Findings

The Speedy Trial Act ("STA") provides that a defendant be tried within seventy days of "the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). The STA, however, mandates that "in computing the time in which a trial must commence there shall be excluded 'delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion.'" § 3161(h)(1)(F); see also *United States v. Mitchell*, 723 F.2d 1040, 1046 (1st Cir. 1983). Though this language "contains no time limits for hearing pretrial motions and acting on them," *Mitchell*, 723 F.2d at 1046, the Supreme Court has construed section 3161(h)(1)(F)as setting forth a two-tiered approach to determining the extent of excludable delay caused by the submission and disposition of pretrial motions.[2] *See U.S. v. Barnes*, 159 F.3d 4, 11 (1st Cir. 1998) (citing *Henderson v. United States*, 476 U.S. 321, 329–30, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986)). In essence, the rule is that any delay permitted is that which is "reasonably necessary." *Mitchell*, 723 F.2d at 1046.

On September 9, 2015, the court referred the Government's Motion in Compliance Explaining Why None of the Government's Evidence Should be Suppressed, Docket No. 135, and the defense's Response in Opposition, Docket No. 142, to the Magistrate Judge for an evidentiary hearing and a Report and Recommendation. Docket No. 143. On April 13, 2016, the Magistrate Judge held a hearing on the motions. Docket No. 161. All the time from September 9, 2015, to April 13, 2016 is automatically excludable as delay resulting from a pretrial motion "from the filing of the motion through the conclusion of the hearing." 18 U.S.C. § 3161(h)(1)(F); *United States v. Salimonu*, 182 F.3d 63, 69 (1st Cir.1999) ("[A]s long as a hearing on the motion is to be conducted before trial, the delay until the hearing automatically should be considered delay 'resulting from' a pretrial motion.'").

At the end of the hearing on April 13, 2016, the Court granted defendant 5 working days to submit a written brief. On April 20, 2016, the defendant filed his brief. Docket No. 164. On April 29, 2016, the government filed a response to defendant's brief. Docket No. 165. On May 4, 2016, defendant filed a motion to strike the response in opposition. Docket No. 166. That same day, the government filed a response in opposition to defendant's motion to strike. Docket No. 167.

The statute "excludes time after a hearing has been held where a district court awaits additional filings from the parties that are needed for proper disposition of the motion." *Henderson*, 476 U.S. at 331, 106 S.Ct. 1871. The speedy trial clock may also be stopped for up to 30 days after the last filing while the Court has the motion "actually under advisement." *United States v. Scott*, 270 F.3d 30, 55 (1st Cir. 2001). Taking these principles into consideration, the time from April 4, 2016 (the day the Court ordered defendant to file his brief) until June 4, 2016 (30 days after the last filing), is excludable. In addition, the First Circuit has adopted the view that the 30–day language contained in § 3161(h)(1)(J) "does not apply literally" when the court is asked to decide many motions, as is the case here. *See United*

---

2. A motion to suppress is a pretrial motion within the meaning of 18 U.S.C.A. § 3161 and the period of time from the filing of a pretrial motion until it is actually taken under advisement by the court is automatically excluded. *U.S. v. Cobb*, 697 F.2d 38 (2d Cir. 1982).

*States v. Anello*, 765 F.2d 253, 257 (1st Cir. 1985).

The defendant in this case has raised complex legal issues that require the careful review and consideration of extensive testimony and a vast record. The court understands that the ends of justice are better served by devoting sufficient time to consider the issues thoroughly. *See United States v. Aquino*, 1 Fed.Appx. 26, 29 (2nd Cir. 2001). Moreover, while the Report and Recommendation was pending, the government filed a second superseding indictment against Cordero. On July 11, 2016, the government filed an informative motion regarding the effect of the second superseding indictment on the adjudication of the motion pending resolution. Therefore, the court had to take pause to consider these new procedural circumstances as part of its analysis of the suppression sought. *Anello*, 765 F.2d at 257 (holding that a delay in deciding new motions was not unreasonable, given that "these new motions raised issues that would turn on the court's resolution of some of the other suppression motions."). Based on these considerations, the period under which the Report and Recommendation was pending constitutes an excludable period of delay under the STA.

Also, because the second superseding indictment filed on July 7, 2012, included a new count, the STA clock was reset. *See United States v. Barnes*, 251 F.3d 251, 258–59 (1st Cir. 2001). After applying the exclusions I find that the new effective STA date is March 20, 2017.

### III. The First Circuit's Mandate

Since the First Circuit's opinion of May 4, 2015 (the "Opinion") sets the roadmap for any subsequent proceedings on the suppression issue, it merits independent mention. The First Circuit held that the PRPD's February 4 and February 26 searches were invalid because they violated Cordero's Fourth Amendment rights. *See United States v. Cordero–Rosario*, 786 F.3d 64, 71–72 (1st Cir. 2015); *see also* Docket No. 125 at page 20. The issue, then, is whether the evidence upon which the federal charges are premised has a separate, independent basis. On this matter, the First Circuit's directive is clear. First, the District Court may hold an evidentiary hearing "to determine whether the Puerto Rico police's prior searches so tainted the evidence the federal agents later obtained pursuant to the consent that the defendant's then-wife supplied that such evidence must be suppressed." *Cordero–Rosario*, 786 F.3d at 66–67, and Docket No. 125 at pages 3–4. Should the District Court find that suppression is required, then the court must also determine which evidence must be suppressed. *Id.*

### IV. Findings of Fact

A detailed, chronological description of the factual background is essential in this case. The First Circuit recognized it as such when, despite making its own findings of facts, it encouraged the District Court to "feel free to explore fully the historical facts as it deems necessary." *Cordero–Rosario*, 786 F.3d at n. 1. Guided by that notion, I will piece together the factual backdrop, as told by the witnesses who testified at the hearing, and as gathered by the evidence on the record.

At the hearing, the ultimate burden of persuasion fell on the government to show that the evidence it intends to present is untainted. *See Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).[3] Though I will not delve expansively into the lewd acts claims because such charges are not before me, I must necessarily examine some elements of that initial investigation for context.

**3.** To that end, the government presented 4 witnesses.

### (i) The state investigation [4]

It was on Thanksgiving day, 2010, that Martorell learned her husband had committed lewd acts against their daughter.[5] It wasn't until January of 2011, however, that Martorell asked Cordero to leave the house where they lived with PCM and a younger daughter.

On February, 2011, PCM spoke to a teacher and to the school's social worker about the lewd acts incident. As a result, the Department of the Family of the Commonwealth of Puerto Rico commenced an investigation and a protective order was issued on February 4, 2011.[6] On that same day, the PRPD agents interviewed PCM and, with the information gathered, PRPD agent Noel Ramos Ortiz[7] swore an affidavit in support of a search warrant. The object of the warrant were any desktop computers, towers, laptops, monitors and other devices to be found at Cordero's residence, located in Apt. 2704 of Jardines de Parque Escorial, in Carolina. See Government's Exhibit No. 8,[8] and Docket No. 86–1.

A warrant was issued and executed later that day. During the search, the PRPD seized a desktop computer and other electronic devices. A subsequent examination of the computer seized revealed child pornographic images of a girl identified as Cordero's neighbor. The police referred to her as MMTH.

On February 25, 2011, Agent Ramos filed a second affidavit with the Court of First Instance to search for other evidence "that was left behind" during the first search, particularly some cameras and memory cards. Docket No. 51–2. The warrant was issued and a second search ensued on February 26, 2011, where the PRPD seized another group of electronic devices. Id. This search was conducted in the presence of Martorell only.

By March, 2011, while Martorell was hospitalized receiving psychological treatment, she learned that Cordero was being accused. As she read the news on her phone, she found out that the police had extracted images of child pornography from the family's desktop computer. The images showed a minor female who had been identified as Cordero's neighbor. Martorell said that she had previously heard from the state prosecutors that there could be some photos of a sexual nature in the computer, but was not ex-

---

4. At the hearing, I allowed Martorell to go over the events that led to her acknowledgment that Cordero had committed lewd acts against their then 13–year-old daughter, PCM. The reason why I allowed this testimony, notwithstanding the defense's standing objection to that line of questioning, was to establish the chain of events that, ultimately, led to Martorell's consent to the search of the computer and the other electronic devices seized, and to fully explore whether her consent was tainted by the prior illegal searches.

5. Martorell testified that on that day, PCM told her that her father had "touched her." PCM related to Martorell that, while she slept, her father had gone into her bedroom, and that she woke up feeling that somebody was touching her private parts. When she opened her eyes, she saw, through the mirror on her bedroom's hallway, that her father was hiding behind the door. After that conversation, Martorell asked her whether she wanted to go to the police, or to get psychological help, and PCM said that she wanted to get help. During that time, Cordero continued to live in the house.

6. Martorell was not present at the house when the police went to serve the protective order. When she returned a few days later, she saw that the house was turned upside down. She also realized that the police had taken the computer.

7. Ramos–Ortiz was assigned to the Carolina Sexual Crimes Division.

8. According to Martorell, PCM indicated that she had seen her father watching pornography in the family computer.

pecting them to be pictures of a minor, much less of their neighbor, MMTH.

After being released from the hospital, Martorell went back home. A few days later, she had a meeting with the state prosecutors where they showed her some of the pictures that had been recovered from the computer. Some depicted MMTH, and others depicted Cordero's penis. After the meeting, she was "desperate" and started going through Cordero's belongings.

Around that time, Martorell started asking the state prosecutors to notify federal authorities. When they responded that they had already contacted them,[9] Martorell said that she began to wait for a call from the federal agents.

### (ii) The federal investigation

On or around April of 2011, Rebecca González, then Group Supervisor of the Cybercrimes Unit at Homeland Security Investigations ("HSI"), heard in the news that the PRPD had found child pornography in items seized at Cordero's home as part of an ongoing lewd acts investigation.[10] According to González, she had previously learned through the media that the PRPD had been investigating Cordero for

having subjected his biological daughter to lewd acts, in violation of Puerto Rico law.[11] González knew the defendant because he was Commissioner of the San Juan Police and had participated in a number of law enforcement coordination meetings where she was present.

Next, González contacted Inés Carrau, then District Attorney in Carolina, to verify what she had heard on the news and to discuss the evidence seized in the state investigation. On April 11, 2011, a meeting took place between González, Carrau, HSI Special Agent Salvador Santiago and state prosecutor Lillian Cabrera. At that meeting, Carrau told González that they had identified a now 19–year-old female from the sexually explicit images extracted from the computer. Carrau showed González a forensic preview of several pictures depicting the victim in sexual poses. At that time, González did not know who MMTH was and the images had not yet been the subject of a federal investigation.

González also received a copy of the state search warrants that the PRPD used to seize defendant's belongings. González testified that as soon as she reviewed the search warrants, she realized that the

---

9. It is unclear whether there was an independent referral made to a federal agency or whether the agents were referring to the González/Carrau meeting, which will be discussed below.

10. Pursuant to the Puerto Rico Penal Code, a "person who, without the intention to consummate the crime of sexual assault" subjects "another person to an act that tends to awaken, excite or satisfy the sexual passion or desire of the accused" under any of the 6 circumstances that the law prescribes, incurs in the crime of lewd acts. P.R. Laws Ann. tit. 33, § 4772. One of the circumstances that the law lists is that the victim had not yet attained sixteen years of age at the time of the events. § 4772(a).

11. During cross examination, the defense questioned the source of González' knowledge

of the existence of child pornography in Cordero's possessions, and suggested that it came about as a result of a tip from the PRPD. Confronting González with a Report of Investigation, ("ROI"), prepared during an interview with Martorell on May 16, 2011, the defense brought to light that according to the ROI, Gonzalez "had received information" about the child pornography materials directly from the PRPD and not from the news. González, however, explained that it is not customary to include in an ROI that an agent received information "from the news," even when that is the case. I find Gonzalez' explanation to be truthful and have no reason to doubt that she, in fact, first heard about the child pornography materials through the news.

search warrant applications were not supported by probable cause to believe that child pornography would be found at the place to be searched. Prompted by that determination, González arranged a meeting with her superiors and members of the United States Attorney's Office, including the United States Attorney for the District of Puerto Rico, Rosa Emilia Rodríguez. At that meeting, González brought the concern she had regarding the state search warrants and it was decided that the federal agents would try to obtain Martorell's consent to search the computer that had been seized by the PRPD. The purpose, in González' own words, was "to create an individual investigation away from the state and local search warrants."

At that point, there was no case number assigned, no agents in charge and no resources allocated. González described it as a "pre-investigation" phase. After the meeting with her superiors, González assigned the case to special agents Lillian Agudelo Doval and Alek Pacheco. She wanted to assign the case to agents that had not interacted with Cordero in the past and that were not aware of the meeting with the Carolina prosecutors.[12]

At the time, Agudelo worked in the cybercrimes team at U.S. Immigration and Customs Enforcement ("ICE").[13] She testified that a few days prior to April 15, 2011, she was preparing a search warrant in

another case when González told her team that the desktop computer the local authorities had seized in the Cordero investigation had yielded child pornography.

A couple of days later, Agudelo was assigned as case agent in the aptly-named "taint team." [14] Agudelo was instructed by González to start the investigation, particularly to reach out and obtain consent from Martorell to search the computer where child pornography had been found. At that point, the computer was in the hands of the PRPD. According to González's testimony, had they not gotten Martorell's consent, they did not have a specific plan and would have had to meet with her supervisors to explore other options.

The agents phoned Martorell and asked her to come to their offices for a meeting. The meeting was held on April 15, 2011 and both Agudelo and Pacheco were present.[15] At the meeting, Agudelo introduced herself as an ICE agent and told Martorell about the allegations that her husband was in possession of child pornography. After discussing the local investigation, Agudelo explained to Martorell that in order to move forward with the federal investigation, they had to obtain consent to search the computer that the state agents had seized.

According to Agudelo, she was trying to determine whether Martorell had common

12. At first, González was going to assign the case to Salvador Santiago but because he went to the meeting with the state prosecutors, she decided otherwise. Unlike Santiago, Agudelo had had no contact with the PRPD regarding the case.

13. HSI is a directorate of ICE.

14. According to Agudelo, prior to the assignment, she had no contact with the state authorities regarding Cordero's investigation. The defense sought to impeach the testimony of Agudelo by citing to portions of her grand jury testimony in this case, where she stated

that she had received a referral from the PRPD, not that she was assigned to the case by her supervisor. During re-direct, Agudelo explained that she meant to say that the referral was received by her agency, not by her personally, since referrals are not effectuated through particular agents. She added that she did not know the specifics of how the investigation initiated, only what she learned through González. I am satisfied with Agudelo's explanation and do not see the semantical discrepancy as a dent on her credibility.

15. González, however, did not attend.

authority to authorize the search of the computer. To that end, she corroborated that Martorell was Cordero's wife and, as such, they lived together at the Carolina residence where the computer had been seized. Martorell explained that Cordero had constructed the computer, that the computer was located underneath the stairway, that it was accessible to anyone in the family and that it was in fact used by the entire family. Moreover, the computer was not password protected and the internet service was in Martorell's name. Martorell also said that she paid for the monthly internet charges.

Based on this information, Agudelo determined that Martorell had common authority to provide consent and she gave her a consent form, which Martorell signed knowingly and voluntarily.[16] *See* Government's Exhibit 2. Martorell told the agents that even though the local authorities had searched her house twice, there was additional electronic equipment that she wanted to turn over. During that meeting, Martorell also urged the federal agents to get involved because she had reservations about the state investigation.[17] According to González, the agents did not show Martorell the pictures of MMTH that had been recovered from the family computer, because she never gave them those images. Unbeknownst to Gónzalez, the state prosecutors had already shown Martorell some of the images.

After the initial meeting, Agudelo called Martorell over the weekend and further asked about the other devices. Martorell reaffirmed that she would surrender them and Agudelo asked her to gather them for the agents to pick up. A couple of days later, on April 21, 2011, Agudelo went to the house to gather the devices, which Martorell had put on top of the dining table. At that point, Agudelo saw a little tower, which she identified as an external hard drive, and asked Martorell if she could take it. As listed in the Receipt for Property, the agents seized two Black Blackberry mobile phones, two silver Pantech mobile phones, a charger of one of the Pantech phones, another Blackberry phone with a SIM card and a 2GB card, a black and red Trascend 2G USB, 9 CDs, 1 DVD, and an external hard drive. *See* Government's Exhibit 3. In following standard procedure, Agudelo kept the evidence in a secure place until she could obtain a search warrant to search the digital devices that had been seized. *See* Docket No. 137–10.

Meanwhile, Agudelo received a preview of the images from Cordero's laptop.[18] Agudelo testified that she obtained them from forensic agent Luis Colón, but that she was not sure whether the images had

---

**16.** The Consent Form, dated April 15, 2011, stated that Martorell authorized the search of the computer and that she was informed of her right to refuse the search. Government's Exhibit 2. The Form also stated that consent was given voluntarily, without threat or coercion, and that it could be withdrawn at any time. The typed consent form had a handwritten portion stating that Martorell authorized the search of the computer that was located below the stairs of her living room. *Id.*

**17.** Martorell expressed discontent with the way that the local authorities had managed the case. She explained that on the day that

the complaint against Cordero was filed and while PCM was still at the police station, the cops called the press to tip them off about the Cordero investigation and PCM's presence at the station. She said that she knew this information because the PRPD agents who gave the tip called the news media where she works.

**18.** Agudelo stated that the seized desktop was under the custody of state authorities at all times, but she was not sure whether it was being kept by the PRPD or by the local Forensic Sciences Department.

been extracted by Colón, or whether they had been provided by the state authorities. The pictures that Agudelo saw portrayed a minor female, MMTH, in sexually explicit poses.

After seeing the images, Agudelo contacted local prosecutors Carrau and Cabrera to let them know that she saw the images of MMTH and wanted MMTH's contact information.[19] Agudelo, Carrau and Cabrera had a meeting at ICE's offices during which the local prosecutors explained how they had procured the images and told Agudelo how to reach MMTH.

On May 12, 2011, Agudelo interviewed MMTH, who was 19–years-old at the time. She arrived at the interview with her parents. Agudelo asked MMTH whether she knew Cordero and how did she know him. MMTH disclosed that she was Corderos' neighbor and a friend of Cordero's daughter, PCM. MMTH mentioned that she would go with PCM to the movies and she would even stay over at the Corderos' house on occasion.

MMTH related that when she was around 13–years-old, Cordero told her that he enjoyed watching her from his apartment.[20] Cordero asked MMTH whether she could walk around her apartment in her underwear so that he could watch her. Sometime later, Cordero drove MMTH, her sister, and PCM to a party, and while in the car, Cordero extended his left arm and gave MMTH an amount of money between $50 and $60. Afterwards, Cordero asked MMTH whether she had thought about his proposition, namely, walking around her apartment in her underwear

for him to observe. From that point on, MMTH started to follow Cordero's instructions. He would text her and subsequently, pay her, every time that she walked around in her underwear.

During the interview, Agudelo showed MMTH the images that had been recovered from the computer. MMTH said that those were but a few of the pictures that she had sent Cordero. She went on to explain that she took many images with a Sony Cyber–Shot digital camera that Cordero gave her and that it was still in her possession. That was the first time that Agudelo had heard of the existence of the Sony camera. Agudelo asked if she would turn over the camera and a few days later, MMTH's mother, Idalia Hornedo, came to ICE's offices and delivered the camera.

A few days later, Agudelo contacted Martorell and said that she had something to show her. Since MMTH had said that the camera belonged to Cordero, Agudelo wanted to check whether Martorell would recognize it. Martorell was surprised and told Agudelo that it was the family camera and that it had been lost for many years.[21]

Subsequently, Agudelo sought a search warrant for the items that had been collected back in April at Cordero's house. Agudelo clarified that she did not include the camera that MMTH had turned over in the affidavit because Hornedo had given her consent to search the camera. *See* Agudelo's affidavit in support of Search Warrant, Government's Exhibit 9 and Docket No. 137–10. On May 24, 2011, the

---

19. According to Agudelo, it was the first time that she had any contact with Carrau and Cabrera.

20. According to Martorell's testimony, and as shown in Government's Exhibit 7, the balconies of MMTH and Cordero's balcony face each other across a street within the same apartment complex.

21. According to Martorell, PCM later told her that, on several occasions, MMTH would give her the camera to pass on to her father. But MMTH would ask PCM not to look at the pictures.

search warrant was issued. Douglas Skinner, an agent in the Cybercrimes Unit, performed a digital forensic analysis of the computer during the week of July 25–29, 2011.[22] *See* Government's Exhibit No. 10. The analysis revealed the presence of child pornography and a female was identified as the minor portrayed in the sexually explicit images. As stated in Skinner's report, the desktop computer contained a total of 145 graphic images with 102 of those images being pornographic in nature. *See* Government's Exhibit No. 10.

The Sony memory stick contained 29 digital images, none of which were pornographic. Agudelo explained that although no pornographic images were found on the camera itself, there was a folder on the desktop computer where pornographic images taken with the camera had been downloaded.

Skinner also examined the external hard drive. According to the report, at some point, there were thumbnails of images that appeared to depict child pornography that had been stored, but later deleted. *See* Government's Exhibit 10. The images were not related to MMTH.

In preparation for Cordero's detention hearing, Agudelo asked Skinner to review other items that had been seized at the defendant's house and to analyze a picture provided by Martorell. On January 4, 2012, Skinner performed additional forensic analysis of an external 320 GB Western Digital hard drive seized from Cordero's residence. The external hard drive contained child pornographic content. *See* Government's Exhibit No. 11 at page 4. Skinner also located several pornographic

images on the memory card of a seized silver Blackberry. *Id.*

The last witness to testify was Idalia Hornedo, mother of MMTH. Hornedo had not been initially called to testify but when she heard that there was a hearing scheduled in federal court on the Cordero case, she immediately contacted AUSA Morgan.[23] Prior to the hearing, Hornedo had never spoken to the prosecutor regarding this case.

Hornedo stated that the first time she heard about her daughter's involvement with Cordero was when an officer assigned to the Carolina division showed up at her mother's house to give her a written summons. According to the document, Hornedo and her two daughters were required to appear for an interview at the prosecutor's office in San Juan. Hornedo recalled that the document said something about "sexual crimes division" but did not state why she was being summoned.[24]

When Hornedo and her daughters arrived at the designated place, the agents asked to interview MMTH alone. At that point, Hornedo said that she suspected something was afoot and that her apprehensiveness increased as the interview extended for a long period of time.

Hornedo and her daughters were cited again by the state prosecutors. At one of those interviews, MMTH made a comment to Hornedo that, according to local prosecutor Melissa Vázquez, her supervisors did not want to transfer the case to the federal jurisdiction. Hornedo went into Vázquez' office and confronted her, telling her that

---

**22.** González testified that she wanted to find a forensic agent not based in Puerto Rico to minimize the chances that the agent knew Cordero and was influenced by the high-profile nature of the case.

**23.** Hornedo testified that she found out about the hearing through her mother.

**24.** Hornedo stated that she had read something in the press about PCM's allegations against Cordero and, to calm her mother down, told her that the interview could be related to those claims.

she would go straight to the federal agents.

Next, Hornedo called MMTH's father to discuss what happened. During the conversation, he told her that some federal agents had suggested that they go to ICE's offices because they were going to be summoned there. She followed his advice and took her two daughters to ICE, where she met with González.[25] Hornedo thought she was filing a complaint at the time and that a federal case would be opened.

## V. Analysis

The crux of this case, as the First Circuit framed it, rests on whether the evidence obtained as a result of a Martorell's consent was tainted by the prior unlawful searches that the PRPD conducted. The defense posits that the evidence obtained as result of Martorell's consent was so "tainted" by the earlier unlawful searches that it should be suppressed as illegal "fruits" of the unconstitutional searches that preceded it.

This doctrine, coined the "fruit of the poisonous tree" dictates that evidence obtained during a search may be so tainted by the illegality of a previous Fourth Amendment violation, so as to render it inadmissible.[26] See *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discover-ed and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)(quoting *Nardone*, 308 U.S. at 341, 60 S.Ct. 266)(internal citations omitted).

In the landmark case of *Wong Sun v. United States*, the Supreme Court articulated the following standard as to derivative evidence:

> We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Wong Sun v. U.S.*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)(quoting Maguire, Evidence of Guilt, 221 (1959)).[27]

Both the direct and indirect products of illegal searches and seizures are subject to exclusion. *United States v. Camacho*, 661 F.3d 718, 729 (1st Cir. 2011). However, if "the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint'" suppression is not warranted. *Id.* (quoting *Segura*, 468 U.S. at 805, 104 S.Ct. 3380).

---

**25.** Hornedo does not remember the date of the meeting.

**26.** It was Justice Frankfurter who first coined the phrase in *Nardone*. Wayne R. LaFave, *Search And Seizure: A Treatise On The Fourth Amendment*, 6 Search & Seizure § 11.4 (5th ed.)

**27.** After *Wong Sun*, the Supreme Court expanded its analysis of tainted fruits of police misconduct in *Brown v. Illinois*, 422 U.S. 590, 597, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). For an in-depth discussion of the attenuation exception's historical development, *see* Brent D. Stratton, THE ATTENUATION EXCEPTION TO THE EXCLUSIONARY RULE: A STUDY IN ATTENUATED PRINCIPLE AND DISSIPATED LOGIC, 75 J. Crim. L. & Criminology 139 (March, 1984).

In *Camacho*, the court advanced that the illegality analysis requires "looking at both causation and attenuation." *Camacho*, 661 F.3d at 729. As to causation, "[t]he law is well settled that a 'but for' link between illegal police conduct and the controverted evidence is not in itself sufficient to dictate suppression." *United States v. Jones*, 608 F.2d 386, 390 (9th Cir. 1979)(discussing *Wong Sun*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441). Instead, the analysis should focus on whether the police obtained the evidence by "exploitation of the illegality." *Id.* (quoting *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407.). The attenuation factor should take into consideration "temporal proximity, the presence of intervening circumstances, and, particularly the purpose and flagrancy of the official misconduct". *Camacho*, 661 F.3d at 729 (quoting *Brown*, 422 U.S. at 603–604, 95 S.Ct. 2254). Other factors include a witness' volition in choosing to testify, *U.S. v. Ceccolini*, 435 U.S. 268, 279, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); whether the testimony derives from an independent source, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); or whether it would inevitably have been discovered without the presence of the illegally obtained evidence, *Brewer v. Williams*, 430 U.S. 387, 406, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

Another consideration that has been consistently given weight by both district and circuit courts is the balancing of the social cost of exclusion against the deterrence that the exclusionary rule seeks to achieve. *See Ceccolini*, 435 U.S. at 279, 98 S.Ct. 1054 (recognizing that "considerations relating to the exclusionary rule and the constitutional principles which it is designed to protect must play a factor in the attenuation analysis…"); *see also, Jones*, 608 F.2d at 391.

Though, here, the government argued that the voluntary consent given by Martorell automatically saved the later-seized evidence from any previous taint, the First Circuit rejected the premise. *See Cordero-Rosario*, 786 F.3d at 76–77 (citing to *United States v. Finucan*, 708 F.2d 838 (1st Cir. 1983)("But the fact that the prior unlawful searches by the Puerto Rico police led the federal authorities to a third party who then consented does not in and of itself show that the taint and exploitation concern simply disappears from view…"). Instead, it proposed that the court determine whether the previous illegality "significantly influenced" or "played a significant role" in the later-obtained consent,[28] and cited to the factors discussed in *Finucan* as a guide. *Id.* at 76.

Among the factors considered in granting suppression in *Finucan* were the following: whether the government relied on information from the illegally seized documents in conducting its investigation; whether "[a]bsent the illegal search, the investigators [would] have known the identity of all the third parties [or] what to ask them;" that the seized documents "became comingled with the other evidence in the files and were not treated separately during the…later investigation." *Finucan*, 708 F.2d at 843. The court also considered whether "the third parties would have come forward on their own had the investigators not sought them out." *Id.* at 844.

The government urges the court to focus on the case of *State v. Lane*, which was also cited in the First Circuit Opinion, because the facts are "nearly identical" to the ones here. *Lane* held that the "appropriate inquiry in a consent case" is

---

**28.** This approach was endorsed in *United States v. Navedo–Colón*, 996 F.2d 1337 (1st Cir. 1993); *see also United States v. Maldona-* *do–Espinosa*, 968 F.2d 101, 103–4 (1st Cir. 1992).

"whether the consent was obtained through exploitation or other sufficiently distinguishable means." 726 N.W.2d 371, 381 (Iowa 2007). If the consent is found to be tainted by the illegality, then the evidence seized as a result of the consent is also tainted. *Id.* In short, the *Lane* court proposed that the consent "should be treated as if it were the 'evidence' sought to be excluded." *Id.*

The *Lane* court focused on two issues, "(1) voluntariness [of the consent] under the totality of the circumstances, and (2) exploitation under the fruit of the poisonous tree doctrine." *Lane*, 726 N.W.2d at 377 (citing *State v. Reinier*, 628 N.W.2d 460, 467–68 n. 3 (Iowa 2001)). The *Lane* court's analysis also considered the *Brown* factors, as well as others, including: temporal proximity, the presence of intervening circumstances and purpose and flagrancy of official misconduct. "Purposeful and flagrant conduct exists when (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed 'in the hope that something might turn up.'" *Lane*, 726 NW. 2d at 388 (citing *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (citations omitted)).

In *Lane*, the court expressed: "if the circumstances (time, place and manner) show the initial questioning, or in this case the consent, was given with "detached reflection and a desire to be cooperative," it indicates the presence of intervening circumstances that break the causal chain." *Lane*, 726 N.W.2d at 386.

Applying this legal framework to the facts of this case, it seems clear that Martorell's consent was tainted by the initial illegality. Let us review the chain of events.

After González realized that the state search warrants were not supported by probable cause for child pornography, she assigned Agudelo as case agent, and directly commanded her to contact Martorell to obtain consent. González, however, had already spoken about the case with Carrau and Cabrera, and had seen the forensic preview of the images from the computer. Therefore, she was directly influenced by the fruits of the state officials' misconduct.

The mere creation of a "taint team" is not enough to attenuate the initial taint. González gave specific instructions that the next step was to obtain consent. In fact, González admitted that, had they not gotten consent, they would have had to come up with an alternate plan. Rather than initiating the independent investigation on a tabula rasa, Agudelo reached out to Martorell with the intention of getting consent to search the computer held by the PRPD. As in *Finucan*, the agents banked on the illegally obtained evidence in guiding their investigation, at least in the beginning. Relying on the *Wong Sun* rationale, I find that the police obtained Martorell's consent by exploitation of the illegality.

The previous unconstitutional violation also played a significant role in Martorell's willingness to consent to the search of the computer. Even though Martorell emphasized that she wanted an independent federal investigation, the fact is that she did not come forward on her own. Martorell even testified that she knew the purpose of Agudelo's call as soon as she received it because she had been waiting for the federal agents to contact her.

I have no doubt that Martorell gave her consent willingly and voluntarily, and that she wanted the federal agents to investigate further, but her willingness was already tainted by the previous illegality. When she gave consent, Martorell had already seen some of the images that were in the unlawfully seized computer. What is

more, she had seen those crude images scarcely a month before she signed the consent form.[29] The close temporal proximity between viewing the pictures and granting consent leads this court to the conclusion that the impression of seeing those pictures was fresh in her mind.

Martorell's emotional testimony confirms it. She described how, when she saw the pictures, she kept asking herself whether there could be pictures of her daughter or other victims in there. She also related how she went home after the meeting with the state prosecutors and began to go frantically through Cordero's belongings. It seems that whereas before, Martorell could have harbored doubts as to the extent of Cordero's action—which might explain why she did not come forward previously—seeing those pictures provided confirmation.[30] Weighing these facts, I conclude that Martorell's mental state was deeply influenced by the images that she had seen, the images that had been illegally obtained by the PRPD.

As a final consideration, I will briefly address *State v. Lane*. Though *Lane* is a case from the Supreme Court of Iowa, the First Circuit cited it in its Opinion, albeit only briefly. *See Cordero–Rosario*, 786 F.3d at 78, and Docket No. 125 at page 29. The government relies extensively on the case, claiming it poses an analogous situation, and urging the court to adopt the opinion as a roadmap.

To sum up the relevant facts, *Lane* presented a situation where two policemen illegally entered and searched a garage, which led to the arrest of two individuals. A few hours later, the policemen went to the house of the one of the arrestees,

Lane, and sought consent from his girlfriend to search the residence. The search yielded methamphetamines. Lane moved to suppress the evidence seized at his house as fruit of the poisonous tree of the initial illegal search of the garage.

Though the government awards *Lane* much weight, the facts are distinguishable. First, the girlfriend who consented in *Lane* had no knowledge of the initial illegality. Here, though Martorell did not know at the time of consent that the state searches had been illegal, she had seen the photographs that were the fruit of the illegality. Second, the court in *Lane* made a point that the search of the apartment occurred in a wholly different place, separate from the location of the original illegality. *Lane*, 726 N.W.2d at 384 ("Moreover, Hogan gave her consent, and the challenged search occurred, in a place entirely different from the initial illegality."). The object of the search to which Martorell consented was the computer that had been unlawfully seized. That last factor gives this case a particular angle that was absent in *Lane*.

Martorell's consent flowed directly from the original unlawful search that yielded the images and cannot be said to be the result of "detached reflection." *Lane*, 726 N.W.2d at 386 ("Thus, if the circumstances (time, place and manner) show the initial questioning, or in this case the consent, was given with 'detached reflection and a desire to be cooperative,' it indicates the presence of intervening circumstances that break the causal chain."). Therefore, I find that applying the *Lane* factors inexorably leads to the conclusion that the taint was not attenuated.[31]

---

**29.** Martorell testified that she saw the pictures after she was released from Hospital Panamericano in March of 2011. She signed the consent form on April 15, 2011.

**30.** When asked by the court whether she had suspicions that there was child pornography

in the computer, Martorell responded that she was sure of their existence because the state agents had already found them.

**31.** Though the government avers that the pivotal point where the taint began to dissipate was when Martorell gave consent, the proper

Having decided that the consent given by Martorell was tainted by the prior unlawful searches, it follows that the evidence obtained as a result of the subsequent search of the computer conducted by the federal agents must be excluded.[32]

But the analysis does not end here. Aside from the computer, the federal charges against Cordero are based on evidence recovered from other electronic devices, particularly a 320 GB Western Digital external hard drive, with serial number WMAM1543470. Docket No. 29.[33]

That piece of evidence was turned over by Martorell, unsolicited. During her meeting with Agudelo on April 15, 2011, Martorell volunteered that there were other devices and that she wanted to turn them over to the federal agents. Nothing on the record indicates that the agents had prior knowledge of those other devices or their contents. In fact, Agudelo did not gather those devices on that day. It wasn't until April 21, 2011, six days after their initial meeting, that Agudelo called Martorell to further inquire about the gadgets. Martorell asserted once again that she wanted to turn them over.

This set of circumstances, unlike the chain of events leading to the consent, presents ample indicia of attenuation. Martorell's offer of turning over the devices was an act of volition sufficiently withdrawn from the original illegality. Though Martorell first told Agudelo about the devices during a meeting that was procured and arranged by Agudelo to obtain consent to search the computer, the proximity was attenuated by several factors. Most notably, Agudelo picked up the devices six days later, giving Martorell ample time to ponder about her decision of turning them over. When Agudelo told Martorell that she would retrieve them, Martorell took on the task of gathering the gadgets and organizing them on the kitchen table. These actions are indicative of the "detached reflection and a desire to be cooperative" described in *Lane*. *Lane*, 726 N.W.2d at 386.

As to the "purpose and flagrancy of official misconduct," there is no indication that Agudelo acted improperly and with knowledge that her conduct was unconstitutional. Agudelo was told by her supervisor to meet with Martorell and obtain consent. She had not been present at the meeting with the state prosecutors, had not seen the search warrants and, at that point in time, had not yet seen the images recovered from the computer. When Martorell offered to turn over other devices, she could not foresee any taint from a previous illegality.

Furthermore, Agudelo did not perform a forensic analysis of the external drive right away. First, she obtained a search warrant to search its contents, and finally, on January 4, 2012, forensic expert Skinner produced a report of the analysis of the external hard drive. There are sufficient intervening circumstances here to

inquiry contemplates that the consent itself might be a "fruit of the poisonous tree." *See Lane*, 726 N.W.2d at 381 (establishing that the analysis should be "whether the consent was obtained through exploitation or other sufficiently distinguishable means."). This view is consistent with the First Circuit's Opinion of May 5, 2015, Docket No. 125 at page 26 (expressing disagreement with the argument that Martorell's voluntary consent "effectively immunized from suppression the evidence they [the police] obtained as a result.")

32. The images found in the computer support Counts 1–20 (production of child pornography) and Count 21 (possession of child pornography) of the superseding indictment. Docket No. 29.

33. The evidence from the external hard drive provided the basis for Count 22 of the superseding indictment, which charges possession of child pornography. Docket No. 29.

represent a break in the chain from the illegal action to the subsequent evidence obtained. Based on all these factors, I conclude that the evidence obtained from the external hard drive identified with serial number WMAM1543470 is sufficiently distinguishable from the unlawfully seized evidence so as to not be tainted.

The last piece of evidence that the government intends to use and, consequently, save from suppression, is the live testimony of MMTH. According to Hornedo's testimony, the first law enforcement official who contacted MMTH regarding the allegations against Cordero was a PRPD agent from the Carolina division. He gave Hornedo and her daughters a summons to appear for an interview with a state prosecutor.[34] After MMTH had been interviewed once or twice, Hornedo got frustrated when a prosecutor told MMTH that her supervisors did not want any federal agencies to get involved.[35] Hornedo allegedly went to ICE and met with González. She thought that a federal investigation against Cordero would be opened.

Agudelo, however, did not identify MMTH's whereabouts through the information that her mother relayed, but through Carrau and Cabrera. On May 12, 2011, Agudelo interviewed MMTH.

To determine whether MMTH's live testimony was a "fruit of the poisonous tree," I look to the factors considered relevant in *Ceccolini*. In *Ceccolini*, the Court rejected "a *per se* rule that the testimony of a live witness should not be excluded at trial" despite being tainted by a previous violation of a constitutional right. Instead, it adopted several factors to determine whether the taint that emanates from unlawful conduct can be attenuated when it

comes to live witness testimony, the most significant being the willingness of the witness to freely testify, *Ceccolini*, 435 U.S. at 276, 98 S.Ct. 1054 ("The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness.") The *Finucan* court also awarded weight to this consideration. *Finucan*, 708 F.2d at 844.

The record supports a finding that MMTH would have come forward, either on her own, or prompted by her mother. Hornedo's eagerness to reach out to federal authorities, which she displayed again during the hearing in this case by contacting the prosecutor and asking to testify out of her own will, is a testament to her disposition. The same can be said for MMTH. When contacted by Agudelo, MMTH did not refuse to be interviewed and nothing on the record shows that her testimony was coerced in any way. In fact, while being interviewed, MMTH narrated unpleasant details about her interactions with Cordero and revealed that she possessed the camera where the seized pictures had been taken, information that was not known to the PRPD. Moreover, the interview with MMTH took place in May, three months after the PRPD had illegally seized Cordero's computer.

An examination of these facts leads to the conclusion that those statements were the product of detached reflection and a desire to be cooperative. Ultimately, the record shows that the illegality which led to the discovery of MMTH did not play a significant part in her willingness to come

---

**34.** Hornedo could not recall the date of this interview or subsequent ones.

**35.** Though Hornedo did not explain the basis of her frustration, it is worth noting that, at

the time of his arrest, Cordero was a high-ranking law enforcement official in Puerto Rico. Martorell herself had expressed fear that the local authorities would obstruct and derail any investigation against her husband.

forward. Thus, this factor weighs strongly in a finding that MMTH's live testimony was sufficiently attenuated from the initial violation.[36]

The second factor that the *Ceccolini* court considered was whether applying the exclusionary rule "would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered." 435 U.S. at 277, 98 S.Ct. 1054. In this case, precluding the victim from testifying about Cordero's actions would entail an "enormous" [human] cost." *Id.* Balancing the social cost of exclusion vis-a-vis the deterrence of the proscribed conduct, I find that tipping the scale in favor of exclusion would defeat the principles of justice. Furthermore, since I have already ruled that the discovery of MMTH is sufficiently separate from the constitutional violation, this factor also weighs in favor of attenuation. *Ceccolini*, 435 U.S. at 278, 98 S.Ct. 1054 ("In short, since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required.").

Consonant with this conclusion, I also find that the Sony Cyber–Shot camera discovered through MMTH's voluntary statements is not excludable because any taint from the original illegality is diluted through lack of temporal proximity and intervening circumstances. Agudelo had never heard of the camera's existence prior to the interview with MMTH and the record does not show that it was included in any warrant. Hence, MMTH was in no way prompted to turn over the camera, she did so willingly and out of a desire to cooperate. Hornedo delivered the camera to ICE's office a few days later. Again, the lapse of time between the offer to produce the camera and the physical delivery of the same is an indication that MMTH pondered such decision. Lack of temporal proximity between the illegal searches that the PRPD conducted and MMTH's voluntary surrender of the camera also lessens the coercive effects of any taint. *Lane*, 726 N.W.2d at 385. Lastly, the factor considered to be the most important,[37] the "purpose and flagrancy of official misconduct" is not indicative of exploitation. Nothing indicates that Agudelo knew at the time that her conduct was likely unconstitutional and engaged in it nevertheless. Nor can it be said that she engaged in misconduct hoping that "something might turn up." *Lane*, 726 N.W.2d at 388 (citing *Simpson*, 439 F.3d at 496 (citations omitted)).

Weighing these factors, I conclude that the government did not obtain the Cyber–Shot camera by impermissibly exploiting the unlawfully seized materials.

## VI. Conclusion

Having analyzed the evidence and weighed all the pertinent factors, I conclude that the consent that Martorell signed authorizing the federal agents to search the desktop computer seized by the PRPD was tainted by the unlawful state search. Therefore, I recommend that the evidence found in the computer pursuant

---

**36.** The fact that Agudelo learned MMTH's contact information through the intervention of Carrau and Cabrera is not determinative. *Ceccolini*, 435 U.S. at 277, 98 S.Ct. 1054 (quoting *Smith v. United States*, 324 F.2d 879, 881–882 (1963)) ("The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.").

**37.** This "is considered the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." *Simpson*, 439 F.3d at 496.

to Martorell's consent, including MMTH's sexually explicit pictures, be suppressed.

The materials found in the 320GB external hard drive, however, are not suppressible, because there was sufficient attenuation between the initial illegality and the evidence obtained.

The exclusion rule does not extend to the live testimony of MMTH either, insofar as she shared the relayed information voluntarily and with detached reflection. Likewise, the Cyber–Shot camera that MMTH turned over is not subject to exclusion.

I thus recommend that neither the pictures found in the 320 GB external drive, nor the live testimony of MMTH and the Cyber–Shot camera, be suppressed.

Accordingly, I recommend that the court grant in part and deny in part the government's motion in compliance at Docket No. 135.

IT IS SO RECOMMENDED.

The parties have fourteen days to file any objections to this report and recommendation. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 5th day of December, 2016.